Jones *v.* Motor Sales Company of Johnstown et al., Appellants.

Argued May 19, 1936. Before KEPHART, C. J., SCHAF-
FER, MAXEY, LINN, STERN and BARNES, JJ.

*Philip N. Shettig,* with him *George W. Griffith* and
*Thomas A. Swope,* for appellants.

*Charles S. Evans,* for appellee.

Opinion by Mr. Justice Linn, June 26, 1936:

This appeal is from a decree requiring appellant corporation to declare and pay a dividend of $14.50 a share to shareholders of record July 10, 1934. One thousand three hundred and fifty (1,350) shares were outstanding. The bill was filed by a stockholder, registered owner of 357 shares, all or nearly all pledged as collateral for loans.[1] Before filing his bill, plaintiff requested that a dividend of $30 a share or as much as was reasonable be declared. The directors considered his request and concluded that the best interests of the corporation required them to decline the request; at the next annual meeting held about six weeks after the bill was filed, 1,133 shares were voted in favor of a resolution approving the action of the directors, and none against it.

The learned chancellor who heard the case entered a decree nisi dismissing the bill on the ground that the evidence warranted the action of the directors. After argument on exceptions to findings of fact and conclusions of law, the chancellor's two colleagues differed from him, sustained exceptions, and entered the decree appealed from, the chancellor dissenting and adhering to his adjudication.

There is no dispute between the parties concerning the law governing the declaration of dividends.[2] They agree

---

[1] 160 shares were pledged for a loan of $17,581 and 188 shares for a loan of $17,100.

[2] See Business Corporation Law of 1933, P. L. 364, section 701, P. L. 404, 15 PS section 2852-701. "Section 701. Directors May Declare Dividends.—A. Subject to any restrictions contained in the articles of the corporation and the provisions of this article, any business corporation, by its board of directors, may declare and pay dividends upon the outstanding shares of the corporation out of its surplus, as hereinafter provided, from time to time and to such extent as the board of directors may deem advisable. Dividends may be paid in cash, in property, or in shares of the corporation, but no corporation shall pay dividends:

(1) In cash or property, except from the surplus of the aggregate of its assets over the aggregate of its liabilities, including in the

that the shareholders are bound to abide by the action of the tribunal set up by them pursuant to the incorporating statutes, in determining whether dividends shall be paid, when, in what circumstances and in what sum, and that the action of the board of directors is final unless, on appeal to equity, fraud or abuse of discretion can be shown. In such case the plaintiff, of course, has the burden of proof. All the members of the learned court below agree that there was no fraud or bad faith. The result is that our inquiry is much simplified; we need only deal with the single question whether the directors acted with discretion in refusing plaintiff's request, or abused the discretion vested in them.

In considering the subject, we at once ask what evidence is relied on to overcome the presumption that the directors performed their duty? On what evidence did the chancellor rely for his conclusion that the directors acted properly? In what respects did the majority of the court reject the chancellor's findings and for what reasons? Do these reasons find support in the evidence?

On proper grounds, the court in banc not only may, but should sustain exceptions to a chancellor's findings of fact; it is a duty that must be performed. In *Belmont Laboratories, Inc., v. Heist et al.,* 300 Pa. 542, 151

latter the amount of its stated capital, after deducting from such aggregate of its assets the amount by which such aggregate was increased by unrealized appreciation in value or revaluation of fixed assets. . . . B. In computing the aggregate of the assets of the corporation, the board of directors shall determine and make proper allowance for depreciation and depletion sustained, and losses of every character, except as otherwise provided in this section. Deferred assets and prepaid expenses shall be written off at least annually in proportion to their use, as may be determined by the board of directors. Amounts of surplus arising from an unrealized appreciation or revaluation of fixed assets shall be shown on the books of the corporation as a separate item apart from surplus profits or paid-in surplus. . . .": *McLean v. Pittsburgh Plate-Glass Co.,* 159 Pa. 112, 117, 28 A. 211; *Pardee v. Harwood Electric Co.,* 262 Pa. 68, 72, 105 A. 48; *Hopkin v. Union Canvas Goods Co.,* 104 Pa. Superior Ct. 264, 158 A. 301.

A. 15, the rule was stated as follows: " 'The nature of the principal differences of fact between the chancellor and the court in banc, again compels us to call attention to the well settled rule that though it is the duty of the latter to review carefully such of the findings of fact of the former as have been made the subject of exceptions . . . yet great weight is to be given to those findings in cases where, as here, they depend, in large degree, on the credibility of witnesses whom he saw and heard, and whose testimony, for that reason, he is best able to weigh, . . . as the tone and manner of a witness not infrequently indicate whether or not he is telling the truth.' . . . The court in banc can properly disregard such findings only in a clear case and then by putting upon record its reasons for so doing. . . . In the instant case the court in banc gives reasons for its action, but they are not convincing, and, as neither that court nor this saw or heard the witnesses, we are in as good a position as it to weigh the evidence. . . . Furthermore, under the former practice, the court could only reverse the master's findings of the facts in a clear case. . . . Where reasons are so given, it becomes the duty of an appellate court to fully and carefully examine them, together with the entire record, and determine whether the action of the court in banc is justified, keeping in mind the weight to which the original findings are entitled and also the reasons given for their overthrow. So doing, we have reached the conclusion that the action of the court in banc cannot be sustained."

When we examine the divergent views entertained below in the light of the evidence, and the rule quoted, we can find no ground whatever to support the decree complained of. Apart from the presumption that the directors acted within the powers conferred on them, the evidence not only supports their action, but is such that a court of equity cannot disregard it without usurping the powers of the directors and substituting its judgment for the judgment of the persons—the statutory donees of

the power—designated by the shareholders for the settlement of such differences among themselves.

A brief statement of the facts will show that there are at least three datum-points or facts about which there can be no reasonable dispute and which settle the controversy against the plaintiff.

The corporation was organized in 1919 by three men: Costlow owning three-fifths of the capital stock, Burns (not now connected with the corporation) owning one-fifth, and Jones, the plaintiff, who then owned one-fifth. Costlow died in August, 1933. The corporation had a prosperous career in selling automobiles until 1932. In 1932 and 1933, it lost money; in 1934 it made $18,-259.18. The first basic and undisputed fact is that in 1929 the directors, of whom plaintiff was then one, determined by a unanimous vote a dividend policy in the following resolution: "Resolved that the policy of this company as to dividends be as follows: During the year 1929 and until a change therein is made by the Board of Directors, to pay to the stockholders in the form of cash dividends from time to time during the year as the same may be declared by the Board, approximately one-half of the net earnings of the company from January 1st, 1929; the remaining earnings to be held for the purpose of a reserve for operation, either in the present business of the company in the purchase and sale of cars, or in financing the same on partial payment plan." That policy was pursued thereafter. As losses were sustained in 1932 and 1933, though the corporation still had a relatively large surplus, no dividends were paid in those years. In 1934 a profit of $18,259.18 was made and on January 16, 1935, in pursuance of the policy declared, a dividend of $4.50 a share was paid; the sum was arrived at by deducting from the profits of 1934, the losses of 1932 and 1933 and distributing slightly less than one-half in dividends.[3] Plaintiff's bill was filed

---

[3] The net deficits in 1932 and 1933 were $5,416.36, which, deducted from the net profit for 1934 of $18,259.18, leaves $12,842.82.

498

September 6, 1934. No abuse of discretion can rightfully be predicated on the continuation of the dividend policy which plaintiff helped to inaugurate.

The next basic fact is as follows. It is agreed that, but for a sum received (in 1933) on a policy of insurance on the life of Costlow, one of the founders of the company, to whose business acumen, apparently, the success of the corporation was due, the surplus in 1934, when plaintiff made his request, was substantially the same as it had been in 1932, and in 1933; that surplus was in a sum which was needed to carry on the operations of the corporation. It is also clear that it is not an abuse of discretion to refuse to declare a dividend which would reduce the surplus below what in past years had been and continued to be necessary for the conduct of the corporation's business.

The third basic fact is that when the manufacturer whose automobiles the corporation was selling cancelled the corporation's exclusive right to sell in a given territory, a radical adjustment of its activity was needed to meet the new conditions. In prior years, to get the most out of its exclusive contract, the corporation had erected large storage facilities, said to be valued at $65,000, for the purpose of caring for the cars required to be sold; when the exclusive franchise in the given territory was taken, the need for this storage capacity ceased; the place was not required and the investment was no longer profitable. The chancellor and his colleagues differed about the value of these warehousing facilities, but it is clear that, as the facilities were not required for the time being, their value as an earning asset had greatly diminished. It became desirable, then, to see whether any, and if so what, changes in the conduct of its business should or could be made to supply increased earnings to take the place of those formerly earned while the corporation had the exclusive franchise. The directors—and, subject to stockholders' veto, it was their problem—determined to finance, on a larger scale

than formerly, the sale of cars by a system of credit extended to purchasers of its cars. Certainly this was a subject for the consideration of the corporation and not for the court, and, so far as this record shows, this point of view is not challenged by plaintiff. The court in banc and the chancellor differed as to the amount necessary to carry out this policy: as to this difference the evidence supports the chancellor's finding that "a sum of money in cash at all times of not less than $40,000 and at the peak seasons of sales, the sum of $50,000" is required, and does not support the revised finding of his colleagues that "The corporation requires for all purposes in the successful conduct of its business a sum of money in cash at all times of not over $40,000." We can find no reason in the opinion filed by the majority below for changing this finding, though the rule requires that one be given. The evidence of Griffith[4] and of the accountant Egts is positive on this point, and, having been credited by the chancellor, must be accepted, in the absence of other evidence to support the exception sustained by the court in banc.

Dealing with those substantially undisputed facts, then, we must conclude that the dividend policy agreed upon in 1929, with the assent of plaintiff, has been faithfully pursued into 1935, and that there is not only no

---

[4] Griffith also referred to the necessity for this sum without regard to the expansion of the business by increasing the extension of credit to purchasers; he said, referring to the necessity of the minimum of $40,000, with a $10,000 increase during peak periods: "it has [been necessary] but of course that is without considering the proposition of financing our new standard line of automobiles." He also testified without contradiction: "Well, another reason making it inadvisable to declare a cash dividend at the time was that the banking situation was such and had been such that it was almost impossible for the Company to obtain credit and we felt that possibly we would not be in a position to secure it, and therefore felt that it was necessary to keep a larger cash balance than would be true in ordinary times."

proof of abuse of discretion, but that the proof supports the action of the directors.

This brings us to the remaining element in the case. The success of the corporation is attributed by the evidence to the capacity of Frederick Costlow, one of the three original incorporators, who then owned three-fifths of the capital stock. In recognition of the value of his services, and to avoid any disastrous result to the corporation that might follow his death, the corporation insured his life in the sum of $35,000. He died in August, 1933, and the corporation received the proceeds of the policy, which, without considering the loss suffered by his death, increased its assets by that sum.

The receipt of the insurance doubtless suggested plaintiff's demand for a dividend. The action of the directors in refusing to declare a dividend of that sum finds support on two grounds. (1) The resolution establishing the dividend policy already referred to as having plaintiff's approval, limited dividend declaration to approximately one-half of the net earnings. The insurance was not net earnings within the contemplation of the parties. In *U. S. Life Ins. & Trust Co. v. Brown (No. 2)*, 270 Pa. 270, 272, 113 A. 446, we said: "To sustain a contract of this character, it must further appear that there is a real concern in the life of the party named, whose death would be the cause of substantial loss to those who are named as beneficiaries. This does not follow the cessation of ordinary service, but arises where the success of the business is dependent on the continued life of the employee. In the latter case the insurance contract will be upheld [citing cases]." The defendant company had an insurable interest in Costlow's life and the insurance was received as indemnity for the loss so resulting to the corporation. In *U. S. v. Supplee-Biddle Hardware Co.*, 265 U. S. 189, in a suit to recover income taxes assessed and paid under protest on the proceeds of life insurance policies received by the corporation on the death of its president, it was held that the proceeds

were not income within the Revenue Act of 1918 and had been wrongly taxed. The court was asked, but found it unnecessary to characterize the proceeds as capital: "It is earnestly pressed upon us that proceeds of life insurance paid on the death of the insured are in fact capital and can not be taxed as income under the Sixteenth Amendment [citing cases]. We are not required to meet this question. It is enough to sustain our construction of the act to say that proceeds of a life insurance policy paid on the death of the insured are not usually classed as income. . . . Life insurance in such a case is like that of fire and marine insurance; a contract of indemnity: *Central Bank of Washington v. Hume,* 128 U. S. 195. The benefit to be gained by death has no periodicity. It is a substitution of money value for something permanently lost either in a house, a ship, or a life. Assuming without deciding that Congress could call the proceeds of such indemnity, income, and validly tax it as such, we think that in view of the popular conception of the life insurance as resulting in a single addition of a total sum to the resources of the beneficiary, and not in a periodical return, such a purpose on its part should be express, as it certainly is not here." And this accords with accounting practice,[5] which, while not conclusive, is of interest as showing an accepted understanding of the problem.

(2) Costlow's son was appointed manager at a moderate salary, subsequently increased. He was, in a sense, an untried man whose capacity to continue the success

---

[5] "The collection of a policy by a corporation will be recorded by crediting Surplus with the entire amount received, if no Cash Surrender Value account appears on the books. If a Cash Surrender Value account has been set up, this account should be credited with a sufficient amount to close it, and the balance should be credited to Surplus": *Finney, Principles of Accounting,* volume 2, page 115. "The credits would be made in two accounts, one to the account 'Cash Surrender Value of Life Insurance Policy,' to eliminate the asset set up during the previous years, and the second credit being to Surplus": *Kester, Accounting,* volume 2, page 214.

achieved by his father's management remained to be demonstrated. Conditions had seriously changed in other respects. As has been stated, the exclusive territorial franchise had been cancelled; competition was now possible; the $65,000 warehousing facilities no longer produced the earnings for which they were originally constructed; the business had sustained losses in 1932 and 1933; it was necessary to find methods of checking these losses and of supplying them by profitable business. Could that be done? The corporation, for some period of time, gave consideration to an extension of the practice of financing its purchasers by carrying them with its credit. In the considesation of that problem, the directors had now in the treasury the insurance money, $35,000, created and received to tide over its affairs in the event of Costlow's death until, if possible, its effect on the corporation's business had been minimized.[6] The results of the deliberation on this problem were that it was determined to increase the extension of credit to its purchasers to the extent allowed by this ac-

---

[6] One of the directors testified that they thought that "that accumulation of insurance [should not] be paid out immediately to the stockholders as cash dividend, but that it should be carried over during the period of transition, for during that time a new manager might be broken in. That's one reason for the Board of Directors declining to declare any distribution by way of dividends at the time." Another testified: "Yes, and we had other reasons because my brother and I [both directors] were not exactly sure of what we were going to do with the business. Another thing, we were replacing productive machinery and we didn't know whether the loss of my father [Frederick Costlow] would materially affect the company or not. We had experienced two years' loss prior to 1932 and 1933 along with that loss of his [him?] in the business and we didn't know what the future had in store for us." The plaintiff's reason for requesting the dividend appears to have been purely personal and not in the general interest. He testified ". . . and I thought that they should declare such dividend as would enable me to carry the stock [pledged as stated above] and I would continue to coöperate with them as I had from the organization of the Company."

cretion to its assets. This conclusion was in the interests of the entire shareholding body; if it should turn out to be ill-advised, the shareholders must bear it as an act performed by their representatives; but no court, on this record, can say that it is a business policy that should not have been adopted. It is agreed that there is no fraud; the evidence is that the corporate action was in good faith; it was done by persons who, since 1919, had on the whole conducted the business profitably; it was done by the persons, who, under the agreement of the shareholders, were expressly authorized to do it. Having so determined what should be done with the insurance money, it could of course not be distributed as dividends.

Decree reversed at appellee's costs.