Jones, Appellant, *v.* Costlow et al.

Argued January 10,1944. Before MAXEY, C.J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

reargument refused April 10, 1944.

Cecil P. Harvey, with him Walter Jones and Evans & Evans, for appellant.

Philip N. Shettig, with him Thomas A. Swope, of Shettig & Swope, for appellees.

OPINION BY MR. JUSTICE HORACE STERN, March 20, 1944:

It is perhaps natural that plaintiff should feel aggrieved by the loss of his stock in a prosperous corporation through its sale by the pledgees to whom he had assigned it as collateral, but that he is justified in attributing his misfortune to any improper conduct on the part of the directors of the corporation is an entirely different proposition and one that is not supported by the evidence in this case.

Motor Sales Company of Johnstown was incorporated in 1919 and since then has carried on an automobile sales agency and general garage business. At the time of the events here involved the principal stockholders were the Frederick Costlow Estate, which owned 841 shares, Walter Jones, who owned 357 shares, and George W. Griffith, who owned 106 shares; the directors were Lawrence B. Costlow and Alice Costlow Thompson (who were trustees of the Frederick Costlow Estate and as such had the right to vote the shares belonging to the estate) and George W. Griffith. Plaintiff was, and for several years had been, indebted on his notes to the United States National Bank of Johnstown for loans of approximately $17,000 and had pledged to it 160 of his shares as collateral security; he was likewise indebted to the First National Bank of Ebensburg on his notes for loans in approximately an equal amount and had pledged to it 188 shares. He went into bankruptcy in 1933 whereby he lost title to his stock and, on the other

hand, was discharged of the obligation on his notes; through a straw person, however, he bought from the trustee in bankruptcy, under a decree of the referee, all of his 357 shares, subject, of course, as to 348 of them, to the lien of the banks; the total price paid by him for this stock, together with several other corporate stocks which he had owned, was $50. Thereupon he renewed or re-affirmed his indebtedness to the Ebensburg bank, giving it new notes to which the bank transferred as collateral the pledged stock which it had held on the old ones; he did not novate his indebtedness to the Johnstown bank. On the suggestion or request of the national bank examiners the banks caused the shares to be transferred into their own names respectively, in the case of the Johnstown bank on August 22, 1934, and of the Ebensburg bank on August 10, 1937, but they continued to carry the stock as collateral for plaintiff's loans, and credited to his account all dividends thereafter received. On December 22, 1939, the Johnstown bank sold the 160 shares to Lawrence B. Costlow, and on July 24, 1940, the Ebensburg bank sold the 188 shares to the Motor Sales Company.

Partly because of the unnecessarily large record of over 700 pages, with 234 exceptions filed by plaintiff in the court below and 103 assignments of error on this appeal (the bill in equity and the answer alone cover 147 pages), it is somewhat difficult to apprehend precisely the theory upon which plaintiff seeks relief. The prayer of his bill is that defendants be declared trustees ex maleficio for his benefit of the shares sold by the banks, that these shares be declared to be his property and that their transfer to him be ordered by the court together with all dividends paid thereon since their acquisition by defendants; also that defendants pay to him his share of all excessive salaries drawn by them.

Plaintiff's counsel states in his brief that there are two controlling questions to be decided on this appeal, the first being whether or not plaintiff has lost his title to the 348 shares of stock. As to this, we are in accord

with his contention that he was not deprived of his equity therein when the banks had the stock transferred into their own names in 1934 and 1937 respectively. The testimony indicates that, in effecting those transfers, the intention of the banks was not to take over the absolute title to the stock, but merely to enable themselves to collect the dividends directly instead of depending on plaintiff to relay them (as apparently he had sometimes failed to do), and, in general, to evidence more clearly their right, title and interest as pledgees; in so doing they were not guilty of conversion or of any impropriety: see 18 C. J. S. 1026, § 430, notes 98 and 99. But when they subsequently sold and transferred the stock to Lawrence B. Costlow and the corporation they passed a valid title thereto and completely foreclosed plaintiff's equity therein. He does not contend that they lacked the right to sell the collateral at private sale and without notice; this right presumably was given by the notes and, if given, was valid and proper: *Read v. Pennsylvania Company for Insurances on Lives and Granting Annuities,* 338 Pa. 389, 392, 12 A. 2d 925, 927; the notes themselves were not put in evidence, nor have the banks been made parties to these proceedings. In any event defendants acquired an unimpeachable title to the stock because they were not informed as to any limitation of the banks' authority to sell it: *Burton's Appeal,* 93 Pa. 214; *Gilbert v. Erie Building Association,* 184 Pa. 554, 39 A. 291; *Shattuck v. American Cement Co.,* 205 Pa. 197, 54 A. 785; *Colonial Trust Co. v. Central Trust Co.,* 243 Pa. 268, 90 A. 189. There is no evidence in the record to establish that defendants, beyond knowing that the stock had originally been pledged by plaintiff with the banks, that he was in financial distress, and that his notes had been in default, had reason to believe otherwise than that the banks, which then held the stock in their own names, were the full and absolute owners thereof.

Plaintiff's challenge of the validity of the transactions is apparently based, not upon any defect in the mechanics of the sales, but upon the charge that the

prices were inadequate and also that defendants, as directors of the corporation, had conspired to defraud him of his stock by withholding dividends thereon so that he would be unable to pay the interest on his loans and thus the banks would be forced to sell the stock and defendants could acquire it by purchase. As to the charge of inadequacy of the prices, the court below found that plaintiff had not proved a higher market value of the stock than that at which the banks sold it, namely $75. per share in the case of the Johnstown bank, and $90. per share in the case of the Ebensburg bank. It is true that the book value at the times of these sales was somewhat over $200. per share, but, while undoubtedly a factor, book value is far from conclusive as to market or salable value, and this is especially true in the case of a corporation such as this, where anyone, other than defendants, purchasing these shares would be in the undesirable position of a minority stockholder in a closed corporation conducting a business of a highly hazardous and speculative nature. There was no general market for the stock, and it is the price which was actually obtainable and not any hypothetical valuation by which the fairness and adequacy of the sale prices must be judged. Ironically enough, it was shown by plaintiff that the book value of the stock at the time he bought it from the trustee in bankruptcy was $178.99 per share; consequently, if, as he now apparently contends, that were to be taken as equivalent to market value, the 357 shares which he thus purchased would have been worth approximately $64,000, and his equity therein, subject to the liens of the banks, would have been $30,000; yet he purchased this entire stock (together with several others) for the sum of $50! Certainly, to be consistent, plaintiff would be obliged to admit that, if his present position is sound, the rights of his creditors in the bankruptcy proceedings were shamelessly ignored with his knowledge, consent and participation, and that the bankruptcy court was woefully imposed upon. It is also to be pointed out that the banks negotiated with other parties, including plaintiff him-

self, but were unable to secure any higher prices than those obtained from defendants. The amounts received were not sufficient, by several thousands of dollars, to satisfy plaintiff's indebtedness and the banks have each suffered a loss on the account; surely, therefore, they would have been eager to obtain better results if possible.

As to the charge of conspiracy and the withholding of dividends, plaintiff's claim is that the directors of the corporation, controlling as they did the majority stock, began plotting in 1934 to "freeze" him out of the company and to acquire his stock for themselves, and, in order to accomplish this purpose, they refused to declare as large dividends as were justified by the earnings, thereby making it impossible for him to maintain his loans and forcing the banks to sell them his collateral. In 1934 plaintiff filed a bill in equity against the company and its three directors asking the court to compel the declaration of a dividend at that time. The proceedings thus instituted culminated in an appeal to this court (*Jones v. Motor Sales Co. of Johnstown*, 322 Pa. 492, 185 A. 809), which held that he was not entitled to a decree since the evidence showed that defendants' conservative policy in regard to dividends was justified by the financial position of the company. Subsequently, in 1936, he brought suit in trespass against the present defendants, claiming that through a conspiracy to defraud him they had caused him the loss of his stock; in that action plaintiff was non-suited. Now again the court below finds, dealing more particularly with the events that have transpired since the termination of those other proceedings, that defendants have been guilty of no fraud, that they have not conspired together, and that, having in mind the need for prudent management of the company's business, the dividends which have been declared were not unduly meagre. It is true that courts may interfere with the declaration or non-declaration of dividends if the directors act fraudulently or unreasonably and are guilty of an obvious abuse of their discretionary power, but the mere fact that a corporation has

a large surplus does not entitle stockholders to the payment of dividends. To what extent the net earnings should be distributed among the shareholders depends largely upon the company's need for accumulated reserves to strengthen its credit, increase its working capital, carry out contemplated projects of expansion, or provide contingencies against future hazards. It would serve no useful purpose in the present case to review the detailed evidence, given by defendants under cross-examination, as to their reasons for not declaring larger dividends; suffice it to say that their explanations satisfy us as they did the court below. The directors were not obliged to consider plaintiff's necessitous circumstances, nor is there a shred of testimony to indicate that in the policy they pursued they were influenced by selfish motives or were scheming against plaintiff's interests. Had they been so eager to obtain his stock they could doubtless have purchased it from the banks during the course of previous years; they never made any overtures for that purpose and finally agreed to buy it only after they had been solicited by the banks and were faced with the alternative of allowing it possibly to fall into the hands of third persons, which, in a small corporation of this kind, would naturally have been undesirable from their point of view. Plaintiff, who was fortunate in being able to retrieve the stock from the hands of his creditors in the bankruptcy proceedings, was subsequently unfortunate in losing it through its sale by the banks; that loss, however, cannot justly be attributed to any plot, design, conduct or actions on the part of defendants.

Apart from all that has heretofore been discussed, there is another reason why plaintiff is not entitled to equitable relief in these proceedings. He did not tender or offer to repay to defendants the money they expended for the stock, nor does he allege even now that he is ready and willing to reimburse them. Except in the case of actual fraud (*McGeary v. Jenkins,* 187 Pa. 440, 444, 41 A. 315, 316; *Luther v. Luther,* 242 Pa. 530, 89 A. 675), which does not exist in this case, there must be an offer

to place the vendee in statu quo ante by refunding to him the purchase money as a condition precedent to the rescission, or the judicial annulment, of the transaction: *Sloane v. Shiffer*, 156 Pa. 59, 64, 27 A. 67, 68; *Schwartz v. McCloskey*, 156 Pa. 258, 265, 27 A. 300, 302; *Lyle v. Shay*, 165 Pa. 637, 642, 30 A. 940; *Stimson v. Stimson*, 346 Pa. 68, 71, 29 A. 2d 679, 681.

The second of the "controlling questions" referred to by plaintiff's counsel in his brief is whether defendants should be required to return to the treasury of the corporation allegedly excessive salaries withdrawn by them. In view of the fact that, as now decided, plaintiff is not entitled to a recovery of his stock, the question thus presented would seem to be of minor importance. While the courts have some measure of supervision over the action of directors in fixing their own salaries as officers or for other services rendered, there should be no judicial interference in that regard unless fraud or overreaching appears: *Lowman v. Harvey R. Pierce Co.*, 276 Pa. 382, 386, 120 A. 404, 405, 406. The court below found that defendants' salaries were not unusual, excessive or unreasonable, and we concur in that finding. At first the salaries fixed were extremely modest, but as the business of the company expanded and the work and responsibility grew accordingly there was ample justification for increases. It was natural and proper that in the bad years the salaries should be reduced, as they were, and that in the more prosperous periods, when the directors believed the company was better able to pay adequate compensation, they should be restored to previous levels. It was not shown that they were greater than those paid in business enterprises of similar magnitude, and it is of some significance that the Chevrolet Motor Company, for whose cars the corporation acted as sales agent, made from time to time careful inspections of the company's budget and never raised any objection to the amount of the salaries paid.

Decree affirmed, appellant to pay the costs.