## Moffett Estate.

160

Argued November 13, 1951. Before DREW, C. J., STERN, STEARNE, BELL, LADNER and CHIDSEY, JJ.

J. *Villard Frampton*, with him *James H. Courtney* and *Frampton & Courtney*, for appellants.

*Francis J. Gafford*, Deputy Attorney General, with him *Robert E. Woodside*, Attorney General and *Milton W. Rosen*, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, January 7, 1952:

The appeals are from an appraisement and assessment of transfer inheritance tax under the Act of June 20, 1919, P. L. 521, as amended, 72 PS section 2301 et seq. The tax is imposed upon "the transfer of any property, real or personal, or of any interest therein or income therefrom in trust or otherwise. . . ." Section 2 of the Act, supra, specifies the rates and how the tax shall be imposed, viz.: upon the *clear value* of the property subject to the tax. The dispute is how the *"clear value"* of closely held corporate common stock is to be determined, viz.: market, book or intrinsic value.

. Ruth Beers Moffett, the testatrix, at her death on August 18, 1947, owned 1666 shares of the common capital stock of a corporation, incorporated to hold and manage the estate of Henry I. Beers. The shares of the corporation (of which the present stock was part) were issued to members of the Henry I. Beers family who were beneficiaries under his will. Ruth Beers Moffett, the present decedent, was a beneficiary and an incorporator.

The appraiser for the Commonwealth appraised the 1666 shares of the Henry I. Beers Corporation, com-

mon, at $50 per share, or $83,300, upon which a tax was assessed (together with other estate assets) at 2%. The *book value* per share was stipulated as $58.29. Appellants in support of their contention that the appraisement was excessive and should not have been over $25 per share, offered testimony that after testatrix's death, the executor sold 200 shares in 1947 at $23.50; 35 shares in 1948 at $25 and 833 shares in 1949 at $24.50. These shares were sold to the *corporation* itself. No shares were issued by the corporation *except* to members of the Beers family and none are now held by others.

It is argued by appellants that the above sales at $25 per share (highest price actually received) must be accepted as establishing the *market value,* which therefore constitutes their *clear value.* There was also testimony concerning earnings and dividends as well as the opinion of expert witnesses that $25, the market price, was the "clear value" of such shares.

The Commonwealth's appraiser testified that in appraising the stock at $50 per share, he did so under the following considerations: "On a basis of a study of the assets in the corporation, the type of corporation, the dividends, the earnings, the type of market for the stock, and other various factors concerned."

As the Act imposes the tax "upon the clear value of the property subject to such tax", (72 PS section 2302, p. 74) we have been required to define *"clear value."* According to the definition of "value" in Webster's New International Dictionary 2d Ed., Unabridged, it is: "monetary worth of a thing; marketable price; Estimated or assessed worth." "Clear" is therein defined: Free from burden, limitation, etc.; as: Free from charges, etc.; *net*; as, *clear* profit.

"Clear value" of such taxable property is, therefore, its estimated net worth. It is manifest that such net worth cannot, in *every* case, be measured by either

market or book value. In some cases, however, in varying circumstances, either market *or* book value of property *may* be its net worth. A stock freely sold on the stock exchange might well have its worth established in such market. But where, as here, stock is closely held and represents but a minority interest, and is rarely sold, (and when sold perhaps under necessity or pressing circumstances) such sales do *not* fairly establish a true market value. Neither do book values, earnings or dividends *alone* establish such worth. On corporate books a valuable asset may be listed at a nominal figure. On liquidation or sale of corporate assets, such an asset may realize a large price, not adequately reflected in book value. While earnings and dividends play an important part in determining the worth of a stock, yet this *alone* is not controlling. This depends upon the financial policy of the corporate management as to what is charged to net earnings and what dividends and the amount thereof are paid to stockholders. All of these elements must be taken into consideration in fixing "clear value."

This Court decided in *McLure Appeal,* 347 Pa. 481, 32 A. 2d 885, that the determination of "clear value" is a *factual* question. Justice LINN said, p. 482: "The clear value of the property was matter of fact. Evidence of probative force in determining the value was relevant and admissible [citing cases]." In that case the executors were required, by decedent's contract, *to sell at a named price,* which they therefore contended constituted clear value. This argument was rejected. The court below found in that case that the *book value* constituted its "clear value." Among the elements considered in fixing the clear value was the corporation's franchise tax report; that the stock was unlisted, was closely held and there were no sales on the market. The tax appraisers and the court fixed the value at $75

per share against the opinion evidence of two experts; one that the value was $25.11 and the other $22.80 per share. Justice LINN said, p. 484: ". . . it must be conceded that if the learned judge was persuaded by other evidence in the case to reject these opinions and to rely on the evidence of higher valuations, familiar rules require that his conclusions must be accepted."

The learned hearing judge below made an analysis of the evidence respecting the value of the corporate assets and their composition, which need not be recited herein. He found, as matter of fact, that the appraisement and assessment of the stock at $50 per share was its *"clear value."* Such finding must therefore be accepted.

Appellants' argument that if the present assessment is affirmed the federal estate tax will be increased is clearly without merit. Such consideration has no place in determining the "clear value" of a taxable asset for State Transfer Inheritance Tax purposes.

The executor of this estate in Appeal No. 159 is a proper appellant from the appraisement and assessment of *personal property* for transfer inheritance tax. Cf. Hunter's Common Place Book, Sec. 6 (a), Vol. 1, p. 613; *Noel's Estate,* 42 D. & C. 614. See also Act of July 15, 1935, P. L. 1028, as amended by the Act of May 27, 1943, P. L. 757, sec. 3, 72 PS 2327. Beneficiary, Marion Moffett Barnes, in Appeal No. 158, is likewise a proper appellant. But the Henry I. Beers Corporation, in Appeal No. 160, is *not* "a person in interest" in this tax appeal, and possesses no status as appellant.

Decree of appraisement and assessment is affirmed. The appeals are dismissed. Each appellant to pay his own costs.

DISSENTING OPINION BY MR. JUSTICE BELL:

Decedent's executor and legatees appealed from the appraisement by the Commonwealth of Pennsylvania of the stock of Henry I. Beers Corporation at a value of $50. per share as of the date of testator's death. Because the majority opinion omits many facts which we consider important, it will be necessary to restate and review the facts.

Decedent died *August 18, 1947,* owning 1666 shares of stock of a small, *closely held family corporation* which was organized *to deal and invest in stocks, bonds, and securities, including its own shares, and in real property.* The number of shares outstanding totaled 9996. The shares were inactive and not traded in on any Exchange. They were offered to the members of the family and to the corporation (who were the only available market) and, as a result, the following *bona fide* sales were made: In 1942, (they were appraised for inheritance tax purposes on the basis of) two sales of 50 shares each at $20. per share; *in 1947, 200 shares were sold at $23.50 per share;* in 1948, 35 shares were sold at $25. per share; and in 1949, 833 shares were sold at $24.50 per share. There were no other sales. The testimony of three witnesses with vast experience as to the value of stocks was rejected by the Chancellor who substituted the impractical conclusions of theoreticians for the opinions of practical men with more than twenty-five years experience in the trade.

The book value of the stock in 1947 was $58.29 per share; while the average book value of the stock for five years prior to and including 1947 was $58.05 per share. The balance sheet as of January 1, 1947 included four principal items: Cash, $236,000., *Marketable Securities,* $243,000., *Notes Receivable,* $95,000., and *Real Estate,* $76,000. There was no evidence what the marketable securities or real estate consisted of or

whether they were carried at cost, or whether the notes receivable were worth their face value! The balance sheet showed that the assets had declined from $631,-828.26 as of December 31, 1937 to $584,943.90 as of December 31, 1947, and the surplus from $113,328.26 to $82,943.90.

In 1947, the ordinary net income showed a loss of $1.20 per share and the "income including capital gains and losses" showed a *loss* of $4.10 a share. In 1946, the ordinary net income showed earnings of $1.10 per share and the "income including capital gains and losses" showed earnings of $7.85 a share. The *average earnings* over a period of five years was *61¢ per share* from so-called ordinary net income; $1.37 a share from "income including capital gains and losses". The average dividend for five years was $1.37 per share; in none of these years was the dividend earned by ordinary income, and in four of the five years it was not earned from "income including capital gains and losses". *The yield from this dividend was only 2.7%,* and as we have seen, *even this was not earned.*

Section 2 of the Act of June 20, 1919, P. L. 521, 72 P.S. §2302 (which imposes an inheritance tax upon the transfer of property by will), provides: "All taxes imposed by this act shall be imposed upon the *clear value** of the property subject to the tax. . . ." There appears to be much unnecessary confusion as to what "value" means. "Value" means "market value": *Kaemmerling's Appeal,* 282 Pa. 78, 82, 127 A. 439; *Washington County v. Marquis,* 233 Pa. 552, 558, 82 A. 756; *Susquehanna Collieries Company's Appeal,* 338 Pa. 366, 12 A. 2d 99; *Jones v. Costlow,* 349 Pa. 136, 36 A. 2d 460. ". . . *the only standard* of valuation recognized by law in making assessments *is market value* as distin-

---

* Italics throughout, ours.

guished from actual value; or, more accurately ex-
pressed, actual value limited and defined by market
value": *Kaemmerling's Appeal*, 282 Pa. 78, 82, 127 A.
439.*

The majority opinion ignores all the aforesaid au-
thorities and adopts as the yardstick or test of clear
*value* "its *estimated net worth*" which is No. 6 of the
17 definitions of "value" contained in Webster's Dic-
tionary. No. 2 defines "value" as "monetary worth of
a thing; marketable price; No. 6 as *"estimated or as-
sessed worth; . . .".* Yet this is the unrealistic standard
on which they predicate their opinion.

The first question is: Shall we adopt as the measur-
ing rod or test of value of a stock, one of Webster's
Dictionary definitions, or shall we follow our own de-
cisions which have adopted the practical yardstick of
the market place, viz., market value, which is the price
a willing buyer would pay to a willing seller?

*If bona fide sales (or sale) are made at or near the
date in question these fix the market value and are
controlling unless evidence is produced to prove that
the sale or sales did not accurately represent or depict
the market value,*—Cf. *Kaemmerling's Appeal*, 282 Pa.
78, 82, supra,—as for example, that the sale was not
between a willing buyer and a willing seller; or that
a higher sum could have been realized at a public sale
than at a private sale, or vice versa; or that the block
of stock sold was too small or too large to reflect the
real market value; or that it was a forced sale; or a
sale at a distorted or inflated price paid to obtain con-

---

* See to the same effect the Act of June 17, 1913, P. L. 507,
§1, as amended which imposes a tax of "four mills on each dollar
of the *value* thereof". The word "value" has always been construed
(with respect to stocks, bonds, mortgages, notes, judgments, etc.)
to mean not par value or face value or book value or estimated
worth, but *market* value.

trol; or any other evidence tending to prove that such bona fide sale did not fairly represent or depict the true market value. If, for example, the common stock of U. S. Steel or American Telephone & Telegraph Company or any other active listed stock is to be valued for inheritance tax purposes, it is by practice admitted or indisputable that its market price would be the proper and only measuring rod of its "value" and no consideration would be given to its book value, its estimated net worth or any other factor or yardstick. *How, then, is it possible to say that the word "value" in the Inheritance Tax Act does not mean "market value", but means instead "estimated net worth"?*

If there were no recent bona fide sales (or sale), or if they do not accurately represent or depict the true market value it is at times difficult to determine market value. In such cases the appraisers, in determining the market value of the stock may take into consideration the following factors, *inter alia*: The nature of the business of the corporation; the industry of which it is a part, and the corporation's position therein; its present earnings, and its earnings record over a period of years; its price times earnings ratio; its present dividend and its past dividend record; its management; its past history; the future outlook for its business; the amount and the nature of its assets and liabilities; the potential market for the stock; the book value; as well as the amount of stock owned by the decedent, i.e., whether he owned a majority, or a large block, or a small percentage of the corporation's outstanding stock, and the dollar value involved.

The second question involved is the weight to be given to each of the aforesaid factors. This will necessarily often vary, but we should avail ourselves of the practical experience of those who daily buy and sell

or deal in such commodities in the markets (or specialize or conduct research therein), and give to each factor the weight and importance which the trade under the circumstances attaches thereto.

The Commonwealth's appraiser admitted that "the *principal factor* in fixing the value of this stock at $50. a share *was its book value* as shown by its corporate returns filed in the Department of Revenue of some $58. a share over an average of five years". As was so well said by Chief Justice DREW in *Aldrich v. Geahry*, 367 Pa. 252, 255, 80 A. 2d 59: "The tax return did not purport to show the market value but only the book value of the assets. *The book value is rarely an accurate representation of the market value. Particularly is this true in a small, closed corporation. . . .* See Jones v. Costlow, 349 Pa. 136, 36 A. 2d 460." What the Chief Justice so aptly said in that case, viz.: that market value and book value are very different and frequently bear no relation to each other; and that book value is rarely ever an accurate representation of the market value (particularly in a small closed corporation), is well known to everyone who frequently purchases or sells stock and is universally recognized by leading brokers and bankers as an accurate market axiom. Generally speaking, *book value is one of the least important factors in determining market value;* while *price times earnings ratio and yield are two of the most important* factors in determining market value.

Moreover, the Commonwealth's appraiser valued this stock at a figure 80 times its average five year earnings of ordinary net income and 36 times its average five year "earnings including profits from capital gains and losses". The unfairness of the Commonwealth's valuation on a price earnings ratio basis is further graphically illustrated by the fact if the "or-

dinary earnings" or the "capital gains and losses earnings" of the corporation in 1947 had been 1¢ a share instead of a loss of $1.20 a share, and $4.10 a share respectively, the Commonwealth's appraisal would be 5000 times earnings. It is well known by every banker and broker in America that the stock of many of the leading corporations of America, which are listed and actively traded in on the New York Stock Exchange, have a market value of from five to fifteen times earnings.* How then is it possible to fairly appraise in 1947 this inactive, unlisted and virtually unknown stock *at 80 times its average five year earnings,* or even at 36 times its average five year "earnings including profits from capital gains", when at that time Union Pacific Railroad Company common stock could be bought (using its mean market price for that year) at *6.3 times* its 1947 earnings, Standard Oil Company of New Jersey at *7.6 times* its earnings, General Motors at *9.4* times its earnings, and even E. I. duPont deNemours (reflecting its outstanding management, and the growth prospects of the chemical business) at *18.7 times its earnings*! Putting it more succinctly, unless a purchaser wished to liquidate the company and needed the stock for control, can anyone imagine a willing buyer paying $83,300. or $50. a share for decedent's block of stock?

In tax matters, federal and state, where there are no recent bona fide sales, it sometimes happens, perhaps unconsciously, that the factor or formula upon which most reliance is placed is that which will produce the largest tax in that case. If there is a sincere difference of opinion on the subject of value, we should attach greater weight to the unbiased opinion of the

---

* As an example, the price earnings ratio as shown by Standard & Poor's Daily Stock Price Indexes for 50 industrial common stocks at the end of the third quarter of 1947, was 9.06.

Trade, who have the additional advantage of wide practical market experience.

In the face of the actual bona fide sale of the stock of this corporation in 1947, and in view of all the other facts in this case, it was *not only clear error* to appraise the decedent's stock at $50. a share, but it was so unreasonable as to be *utterly unjustifiable.\** The same conclusion would be reached even if it be assumed, arguendo, that the sale of this stock comprised too small a block to depict the true market value.

I would reverse the judgment of the court below and affirm appellant's valuation of this stock for inheritance tax purposes at $23.50 a share.

---

\* Mr. L. M. Campbell, vice president and trust officer of the Oil City National Bank (and now present Secretary of Banking of the Commonwealth of Pennsylvania), with thirty years experience, who had full discretionary powers of investing more than $20 million dollars of trust funds, termed this valuation "ridiculous".