## Pincus v. The Mutual Assurance Company

*Pace Reich,* for plaintiffs.

*Harvey Bartle and Erwin Lodge, Irwin Paul, Robert Rosen, Wm. Ewing, Michael Rutenberg, Jenkins, Miller & Jenkins,* for defendants.

KALISH, *J.,* December 3, 1976—

## I. ISSUES

Plaintiffs, Erwin L. Pincus and his wife, Hinda, perpetual fire insurance policyholders with defendant, The Mutual Assurance Company ("Mutual"), have brought this action in equity on behalf of themselves and all other similarly situated Mutual policyholders, seeking to compel Mutual to distribute $10,000,000 of its assets currently held in an unallocated fund.[1] Plaintiffs contend that the $10,000,000 is being held for no legitimate corporate purpose and that the failure of Mutual and its board of trustees, also defendants, to make such a distribution constitutes an

---

1. The history of this case includes an appeal to the Supreme Court of this court's dismissal of the class action objections; an appeal to the Superior Court by plaintiffs of this court's dismissal of plaintiffs' petition for a preliminary injunction seeking to restrain a transfer of assets and liabilities to Mutual; an appeal of this court's granting of defendants' motion for partial summary judgment where plaintiffs amended the complaint to charge that a proxy statement was "false and fraudulent." Additionally, counsel for the class representative commenced a second action in the name of another class representative seeking to restrain the payment of dividends on the same scale as is presently paid to present policyholders. This court denied plaintiffs' petition for a preliminary injunction. See, Tuchinsky v. The Mutual Assurance Company, 4 D.&C. 3d 80 (1977).

unreasonable and arbitrary abuse of the trustees' discretion.

Mutual, its wholly owned subsidiary, The Stock Insurance Company of the Green Tree ("Subsidiary"), and the board of trustees assert that it, the board of trustees, has in fact exercised sound judgment and discretion in the operation of Mutual and its subsidiary. Further, defendants contend that the requested distribution would seriously undermine the financial position of Mutual and the subsidiary. . . .

## III. DISCUSSION

### B. *Merits*

Suits which seek to challenge the dividend policy of mutual companies such as herein involved, are governed by the legal principles applicable to similar suits brought against stock companies: Gross v. Philadelphia Contributionship, 73 D.&C. 2nd 654 (Phila. Co. 1975). Traditionally, the courts of this Commonwealth have been hesitant to interfere with the internal management of corporations: Hopkins v. Union Canvas Goods Company, 104 Pa. Superior Ct. 264, 158 Atl. 301 (1932); Guttmann v. Duquesne Brewing Company, 120 Pitts. L. J. 453 (1972). The burden a plaintiff must meet to compel such judicial intervention is extremely heavy. Only if clear disregard of official duties, arbitrary or manifestly erroneous actions, abuse of discretion, or bad faith on the part of directors or trustees is established may such relief be properly granted: Hopkins v. Union Canvas Goods Company, supra, 104 Pa. Superior Ct. at 266; Gross v. Philadelphia Contributionship, 73 D.&C.

2d at 663. Plaintiffs have failed to meet this burden.

A 1974 actuarial study commissioned by defendants indicated that if present trends in new business, interest income from investments, inflation and dividends continue, it would be in dire financial circumstances as early as 1983 even if it retained all of its present assets. Conversely, plaintiffs assert that the distribution of the $10,000,000 which it contends Mutual holds for no legitimate purpose would in no way harm the financial position of the corporate defendants.

Plaintiffs, in their case, by their own actuarial experts attempted to discount defendants' actuarial information on two grounds. First, they suggest, that even if defendants' information were valid, the great economic loss predicted would result largely from the assumed forecasts of future new business and future dividends; two factors over which the companies have a good deal of control. Plaintiffs urge that defendants could either stop writing new business and in effect become a security investment company and/or modify its dividend practice in relation to limited new business which is written, i.e., use a different, smaller dividend scale.

Such a suggestion would directly contradict several fundamental premises on which Mutual was founded in 1786. As alluded to above in Finding of Fact 24, Mutual was founded to provide fire insurance to the public on the most equal terms, and this was to be accomplished without a view towards profit: Charter of the Mutual Assurance Company for Insuring Houses from Loss by Fire, Act of Incorporation of February 27, 1786 [12 Pa. Statutes at Large (1785-1787) Ch. MCCI, pp. 151-

158] section 1. If Mutual were to stop or greatly reduce its quest for new business in the future, it would no longer be fulfilling the mandate of its original charter to offer fire insurance equally to the public.

In making their request, plaintiffs contend that they are somehow more entitled to the surplus of the company built up over the last 190 years, than some newcomer. Yet, the original charter of this insurance company dictates that its primary purpose for existence is to provide fire insurance to the public in the most equitable manner, not to pay large dividends to existing policyholders. Similarly, a discriminatory dividend policy vis-à-vis new policyholders would violate this same provision.

Keeping the 1974 actuarial study in mind and then by the the prudent use of all of Mutual's assets, the board of trustees hopes to be able to continue serving the purpose for which Mutual was formed. Though under the original charter this was to be done without a view towards personal profit, it must be stressed that presently members of plaintiff class have been and are still receiving generous dividends on their deposits. In fact, the individual plaintiffs themselves have received dividends of up to 20 per cent per year on their original 1955 deposit.

Defendants admit that eventually they must curtail this generous dividend policy although when this will be done will be a function of the future economy, amount of new business being written and competition. Nevertheless, it seems such a determination should be left to the board of trustees. Thus, plaintiffs' initial attack on defendants' explanations must be rejected since "this

represents a disagreement on a matter of business judgment, and one trained in the law who sits as a Judge would indeed be foolish to substitute his opinion and judgment on business matters for that of the duly elected Board of Directors." Guttman v. Duquesne Brewing Company, supra, 120 Pitts. L. J. at 455.

Plaintiffs' second and more fundamental attack on defendants' actuarial evidence deals with the validity of the assumptions on which defendants' actuary made his projections for the future. They submit that the assumptions used in defendants' study as to future expenses, future investment income, future new business and future dividends are so unrealistic as to give an incorrect picture of Mutual's present and future financial positions. In contrast, plaintiffs produced their own actuarial experts who sought to demonstrate that if different underlying assumptions were used, Mutual's future financial picture would be so dramatically different as to permit the requested distribution to be accomplished without any harm to the company.

Specifically, plaintiffs assert that defendants' actuary's assumptions of future investment income are too low despite the fact that they closely resemble the actual experience of Mutual over the past years. It is suggested that by restructuring its investment portfolio Mutual could increase expected income though they do not fully consider such things as the federal income tax impact on such a restructuring. Similarly, they challenge the expense assumptions although they too are closely tied to past experience. Likewise, they challenge the new business assumptions notwithstanding the insistence of Mutual's officers that the introduction of homeowner's coverage by the sub-

sidiary could very well account for such an increase in the future.

Obviously, the validity, accuracy and usefulness of any actuarial study rests largely on the appropriateness of the assumptions on which it is based.

Basically, plaintiffs would ask the court to decide which of the various assumptions such as those described above offered by both sides are the more reasonable. This would be a distinctly inappropriate task for this court to undertake. "[T]he Court should not address itself to the various accounting theories and contentions which would support the payment of a dividend." Guttman v. Duquesne Brewing Company, supra, 120 Pitts. L. J. at 455. Instead, the court must limit its inquiry to the reasonableness of the actions and motivations of those charged with running this insurance company. In so limiting its examination, this court must conclude that defendant board of trustees have not violated their offices.

The instant controversy is virtually identical to that presented to this court last year in Gross v. Philadelphia Contributionship, supra. There, as here, policyholders of a mutual fire insurance company (Mutual's chief competitor in Philadelphia) sought to have the company distribute unallocated reserves. In denying the requested relief, this court observed: "The mere existence of a large unallocated surplus is insufficient grounds for compelling the requested distribution. See, Jones v. Costlow, [349 Pa. 136, 36 A. 2d 460 (1944)]; Green v. Philadelphia Inquirer Company, 329 Pa. 169, 196 Atl. 32 (1938); Guttmann v. Duquesne Brewing Company, supra. Moreover, we are satisfied with the justification given us by defendants for the maintenance of the surplus. The directors

have taken into account such factors as the idiosyncrasies and financial resources of the company, the state of the economy, and trends in the casualty insurance industry in general and in the company in particular, in reaching their conclusion that an unallocated surplus of over $25,000,000 is necessary to secure the financial stability of the company and to enable it to meet its obligations to policyholders under the most adverse of circumstances. That the surplus plays such an important role in the Contributionship's contingency planning is not unreasonable since the essence of its operation as an insurance company is to provide for the unlikely . . . .

"We, therefore, see no reason for substituting our judgment for that of the directors on account of their failure to make any greater distribution of the net income than that which they have deemed 'safe and prudent.' " Gross v. Philadelphia Contributionship, supra, 73 D.&C. 2d at 668-70.

The same considerations were voiced by defendants in the present action. Their position, like that of their counterparts in Gross, must be sustained. Indeed, that the actions of defendant board of trustees were proper is reflected in the vote supervised by then President Judge Jamieson which established that 82 per cent of the policyholders voting and 51 per cent of all policyholders entitled to vote wished to go on record as siding with the board. Though this is not conclusive on the court as to the issue of the trustees' reasonableness, it is strong evidence that many people directly affected by their actions agree with them.

Therefore, given the record presently in front of this court, it is clear that it should not substitute its judgment for that of the board of trustees.

## IV. CONCLUSIONS OF LAW

1. Plaintiffs have brought this suit as a class action on behalf of themselves and all perpetual policyholders similarly situated.

2. This court has jurisdiction over the class representative and all those policyholders represented by counsel.

3. This court has jurisdiction of the subject matter.

4. Plaintiffs have no adequate remedy at law.

5. Plaintiffs may properly maintain the suit as a class action.[2]

6. There has been no abuse of discretion, bad faith, unreasonable, fraudulent, arbitrary or manifestly erroneous conduct on the part of the trustees or the defendant corporations inconsistent with the purposes for which the company was formed in the accumulation of any part of the surplus. Therefore, the court enters the following

---

2. Since the class representative and his counsel are law partners and since the class representative expected to share in the fee, if any, that may have been awarded, defendants raised the question as to whether Mr. Pincus should represent the class and indeed whether this was a proper class action. Until recently, it has been common practice for a law partner to represent the class representative. However, the serious ethical problems inherent in such a relationship were recently discussed by the Third Circuit Court in Kramer v. Scientific Control Corporation, 534 F. 2d 1085 (3d Cir. 1976). In Kramer, though, the court has not yet reached a decision on the merits. Accordingly, Kramer should not be read as mandating the automatic disqualification of counsel. This is so where, as here, the case has progressed so far and the testimony has been so complex and extensive, that a change would substantially delay the termination of this already protracted litigation.

### DECREE NISI

And now, December 3, 1976, upon consideration of the foregoing, it is hereby ordered, adjudged and decreed that the action of plaintiffs is dismissed and judgment entered for defendants (named) against plaintiffs and all other policyholders who have entered appearances.

The prothonotary is directed to enter this decree nisi and to notify the parties, or their counsel. If no exceptions are filed within 20 days after entering this decree, a final decree upon praecipe will be entered.

