Freed's Estate.

Argued October 7, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Thomas Boylan,* with him *Thomas D. McBride, John T. Thompson* and *Robert M. Taylor,* for appellant.

*Howard Zacharias,* with him *Joseph Schutzman,* for appellee.

OPINION BY MR. JUSTICE STERN, November 12, 1937:

In order to vindicate in this case the rejection by the Orphans' Court of an alleged will of decedent offered for probate, it is necessary only to recite the facts established by the testimony of appellant himself, its proponent.

Decedent, Edna L. Freed, was the widow of Dr. Raymond S. Freed of Pittsburgh, who died in 1925, devising to her his entire estate, of an approximate value of $26,000. In 1930 she began occupying an apartment in Ventnor, New Jersey. Her physical and mental health were both poor. In addition to occasional attacks caused by a kidney disease, she sustained a fractured pelvis resulting from an accident. She was extremely despond-

ent because of her husband's death, and occasionally resorted to the use of soporifics and narcotics, such as veronal, codein and morphine. In March, 1931, appellant, Edmund K. Hartley, searching for an apartment to rent, by chance rang Mrs. Freed's bell. An acquaintanceship was thus begun which led to his occasionally staying there over week-ends. She was forty-seven years of age, he thirty-one—a married man with two children. He was a salesman for a brokerage concern; later he engaged in making horse-racing "selections" for newspapers. Reading between the lines of the record, it is easy to perceive that he was plausible and ingratiating. When he first met Mrs. Freed "she was so weak . . . she could barely walk across the room," and was suffering from melancholia. "She was weak and sick. She was walking with the aid of a stick and could hardly get around the apartment, and she seemed very depressed mentally." Companionship developed into meretricious intimacy. She consulted him as to her financial affairs; from time to time she advanced him loans amounting to several hundreds of dollars, on one occasion pawning her jewelry in order to obtain the money for that purpose. They made several trips together, principally at her expense. She gave him $400 to defray his expenses of a trip to Reno to seek a divorce, which, however, he failed to obtain. Although appellant claims that Mrs. Freed gradually became strong and healthy, he admits that when, on Friday, October 16, 1931, she telephoned to him from Ventnor to Philadelphia and discussed the making of a will, she was "depressed and melancholy"; she was "very sick at her stomach and very sleepy," as a result of having "taken too much veronal." In fact, he was so much alarmed, he telephoned to a Mrs. Jefferson who lived in the same apartment house to look after her. In this conversation Mrs. Freed asked him to bring a lawyer to prepare a will. Appellant went down to the apartment on Saturday afternoon, the 17th. He did not bring a lawyer,

however, because he "didn't think Mrs. Freed should make that kind of a will." When he saw her she "was still a little sick at her stomach. . . . She had gotten over most of the sleepiness but she had a very bad headache." He says, however, she was all right on Sunday when they discussed the will again "casually." On Monday morning, the 19th, he arose between half past six and seven o'clock and when he came out of the bathroom Mrs. Freed was waiting for him and said she had something to discuss with him. Telling him she wanted to make a will, she handed him a sheet of paper and asked him to take down what she dictated. She told him she was going to leave all her property to him. It may be stated at this point that Mrs. Freed had signed a comprehensive, formal will under date of July 17, 1929, prepared under professional advice, in which, after gifts of trinkets and sums of money to various relatives and a legacy to Lafayette College, of which her deceased husband was a graduate, she bequeathed the residue of the estate to her mother-in-law and two sisters. According to appellant Mrs. Freed now told him "she was leaving everything to me but she expected me in doing that to give her sister, Agnes Lonergan, one-fourth of her estate, and to see that her aunt, Mrs. Thompson, got $25.00 a month as long as she lived. Those were provisions she charged me with, but did not want to incorporate in the will." As written by appellant the will was crowded upon one page of a sheet of note paper, Mrs. Freed's signature and that of appellant as witness being placed sidewise along the left-hand margin at right-angles to the body of the will. All the real and personal property of decedent were devised and bequeathed to appellant, and he was named as sole executor. Mrs. Freed—so appellant says—went to look for the janitor as a witness but came back and said she could not find him; she asked appellant if he would go upstairs and get Mrs. Jefferson and Mrs. Sherman, living in the same building, to witness the will. Appellant, however, declined

to do this on the ground that it was too early in the morning to call them. Appellant took the will the same day to a lawyer friend of his in Philadelphia, who suggested that it would be better to make a typewritten copy of it with places for attestation by two witnesses. The lawyer made such a copy and sent it to Mrs. Freed but she never executed it. Later—according to appellant—she told him she had shown it to her own counsel in Pittsburgh, but he advised her not to execute it and tore it up.

In 1932 appellant and Mrs. Freed went to Miami, Florida. Soon after her arrival she attempted to commit suicide by swallowing lye; she was taken to a hospital for treatment and there again attempted suicide, this time successfully. She died on January 4, 1933. She and appellant had separated, and it is an interesting commentary that appellant apparently retained so little interest in her that he did not attend her funeral nor even know, at the time of the hearing in the Orphans' Court, where she was buried.

On January 18, 1933, decedent's will of July 17, 1929, was admitted to probate in Pittsburgh. Appellant, alleging the execution of the will dated October 19, 1931, appealed to the Orphans' Court from this probate. The Orphans' Court, in pursuance of a stipulation of counsel, directed that the probate be opened and appellant allowed to produce the alleged later will before the register of wills. After hearing some testimony the register certified the record to the Orphans' Court under the Act of June 7, 1917, P. L. 415, section 19. Neither party requested a precept to the court of common pleas for an issue d. v. n. The Orphans' Court held a hearing at which, except for a person called to identify Mrs. Freed's signature, the only witness was appellant. The court concluded it had not been satisfactorily proved that decedent executed the alleged later will, nor that it represented her free and independent act, and accordingly directed the register of wills to probate the will of 1929.

The argument on the present appeal from that order was largely upon the questions whether, in the eye of the law, there was a confidential relationship between decedent and appellant, and whether the latter had the burden of proof. In our opinion it is not necessary to decide these matters, because, even if the court below was mistaken in holding that the burden lay upon appellant, his own testimony made the inference of undue influence irresistible and thereby destroyed the will. Recapitulating the salient elements of the situation, we have (1) a woman ailing in mind and body, despondent and melancholy, the victim to some extent of drugs, and ultimately a suicide; (2) a married man sixteen years her junior, found by the court below to be "a gambler," "an impostor and one who is without care for honor," and who became her paramour; (3) his repeatedly accepting moneys from her, and, as a salesman of securities, advising her as to her investments and financial affairs; (4) his writing for her a will under extraordinarily suspicious circumstances, after he had refused her request to bring either a lawyer or witnesses; (5) this will bequeathing to him, seven months after she had first met him, her entire estate, and revoking a carefully drawn previous will in which she had faithfully and minutely recognized her obligations to her own family and that of her deceased husband from whom she had inherited most of her property. While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human experience can—and in a case such as the present must—recognize it as the causative factor which linked the execution of this highly unnatural will to the circumstances preceding and attending it, and in which appellant, the sole beneficiary, played such a ruthless and dominating part.

At the conclusion of the hearing, appellant requested the Orphans' Court to grant him a further opportunity

to produce other witnesses who would testify as to an improvement in Mrs. Freed's health prior to the execution of the will, and as to alleged statements made by her that she had provided therein for appellant. The court ruled that, four years having elapsed between the probate of the first will and the hearing, appellant had had ample time in which to obtain and produce his witnesses. This was a reasonable exercise of discretion, and no fault can be found with it.

The order of the Orphans' Court is affirmed; costs to be paid by appellant.