Quein Will.

134

Argued November 10, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Thomas C. Gawthrop*, with him *W. Edward Greenwood* and *Gawthrop & Gawthrop,* for appellant.

*Humbert B. Powell*, with him *J. Paul MacElree*, for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, January 3, 1949:

This case began as an appeal to the orphans' court from a decree of a register of wills admitting to probate two codicils, one dated October 4, 1944 and the other November 9, 1944, to decedent's undisputed will and codicil of April 12, 1944. Contestant, a church, the residuary devisee and legatee, charges that the contested codicils were procured through undue influence. Following the appeal to the orphans' court, and on petition and answer, the issue of fact as to the existence of undue influence was referred to a master. The master found that the questioned codicils were procured through fraud and recommended that probate be refused. The court below sustained exceptions to the report and dismissed the appeal from the register. The learned court below stated (p. 518a) : "The facts found . . . are not the subject of serious dispute." The reason

assigned by the court for its rejection of the master's recommendation was that the master had reached her finding through "deductions or inferences" with which the learned court disagreed. This appeal followed.

Ella M. Quein, the testatrix, a widow in her eighty-eighth year, died April 10, 1945, without issue, with cousins her nearest of kin. Her estate, according to the petition for letters testamentary, amounted to approximately $130,000 and consisted of real and personal estate. By her probated will and codicil dated April 12, 1944 (about which there is no contest) testatrix made numerous specific and pecuniary bequests and gave the entire residuary estate (constituting its bulk) to the Honey Brook Methodist Church and appointed the cashier of her bank and her attorney executors. The two contested codicils were probated with the will and uncontested codicil. An unprobated codicil was executed October 26, 1944. The probated codicil of October 4, 1944 revoked the residuary bequest to the church. In lieu testatrix gave the church a legacy of $3,000 and cancelled its indebtedness to her of $3,000 (already cancelled in 1943); a hospital in Coatesville was given $1,000; the residue of the estate was devised and bequeathed to six individuals: Annie R. Davis, Blanche D. Moore, Clara Johnson, Helen Skiles, Bessie A. Sweeney and A. Marie Sweeney. The second probated codicil, dated November 9, 1944, revoked all bequests to testatrix's cousins, Annie R. Davis and Blanche D. Moore; bequeathed $5,000 to her cousin, Helen M. Skiles; gave $200 each to Mrs. Arthur White and Bessie Helms; bequeathed certain furniture to Helen M. Skiles, Clara Johnson, A. Marie Sweeney and Bessie A. Sweeney; testatrix's former residuary disposition was revoked and in lieu thereof testatrix named *four* (instead of six) residuary beneficiaries: Clara Johnson, Helen M. Skiles, Bessie A. Sweeney and A. Marie Sweeney (omitting

Annie Davis and her sister). Helen M. Skiles was appointed sole executrix.

The executed but unprobated codicil dated October 26, 1944, *merely revoked the residuary gifts to Annie R. Davis and Blanche D. Moore.* The reason assigned for not probating this codicil was because the *probated* codicil of November 9, 1944 contained a similar provision.

Contestant charges that the questioned codicils were obtained through undue influence exerted upon testatrix principally by Marie Sweeney, her trained nurse, and Helen Skiles, a cousin, who was also her attorney-in-fact and in complete control of all her cash and securities. Both individuals are conceded to have occupied a confidential relation. The principal issue is whether, under the testimony, undue influence has been established. The determination of this question largely depends upon the fact whether or not testatrix was weak *in mind* as well as body. Two other possible factors must be considered: was there an imprisonment of testatrix's body and mind and was fraud practiced upon testatrix?

The contestant church was a natural object of testatrix's bounty. She and her husband were active members of, and generous contributors to, the church. After the husband's death in 1916, and prior to the date of her will, testatrix made several wills in which the church received *substantial portions* of her residuary estate. The will of 1944 gave contestant the *entire* residuary estate, constituting its bulk.

After the death of the husband testatrix remained alone in her home assisted by a servant, who subsequently died. She lived in a twin house, one side being occupied by an elderly doctor—Dr. Morton—with whom she was on bad terms. Dr. Bamberger, testatrix's family physician, resided next door. A cousin, Annie Davis, assisted testatrix about the house and attended to

testatrix's banking and business affairs. In July 1942, testatrix suffered a major stroke which caused a paralysis of her muscles of speech and affected her throat. In October 1942, Dr. Bamberger entered the Army. He testified that, in addition to the stroke, testatrix was *then* suffering from infirmities of old age; had rheumatism, bladder trouble and marked arteriosclerosis; *that her physical infirmities weakened her mental capacity and made her suceptible to influence,* especially where the persons exercising it made testatrix more comfortable physically.

When Dr. Bamberger entered the Army he referred all his patients, including testatrix, to Dr. Morton who thereafter became her attending physician. On May 8, 1943, upon the recommendation of her pastor, testatrix employed Anna Phaler as practical nurse, cook and housekeeper. Testatrix subsequently suffered two slight additional strokes. In August 1943 testatrix fell out of bed, fracturing a hip, which thereafter caused her to be confined to bed or in her bedroom chair. After testatrix broke a hip her nursing care proved inadequate. Dr. Morton was requested to secure a trained nurse. The doctor recommended Marie Sweeney, of Downingtown, who accepted the service. She commenced her duties on November 30, 1943. Wages were fixed at the then standard rate of $8 per day and maintenance.

Marie Sweeney, the nurse, took immediate and complete charge of testatrix and her household. She bought the food, paid wages and all household bills. Annie Davis, testatrix's attorney-in-fact, continued to draw checks but the money was paid in a lump to Marie Sweeney who disbursed it. On January 24, 1944 Marie Sweeney discharged Anna Phaler and replaced her with Bessie Sweeney, the nurse's mother—*not* a practical nurse—at a salary of $31.60 a week, later increased to $38.60.

On February 5, 1944 testatrix caused her attorney, Carl B. Deihm, Esq., to prepare a codicil to her will of February 24, 1943, whereby Marie Sweeney was given a legacy of $500 and her mother, Bessie Sweeney, a legacy of $100. On February 19, 1944 testatrix added a second codicil giving Annie Davis an additional legacy of $1,000.

In April 1944, *Marie Sweeney* informed Annie Davis that testatrix wanted to make another will and requested Miss Davis to advise testatrix's attorney Mr. Deihm. Miss Davis did so inform Mr. Deihm, who prepared the probated will and codicil of April 12, 1944. By the will the following bequests were made: Annie Davis (cousin) household goods and a legacy of $5,000; Blanche Moore (Annie Davis's sister) household goods and $600; Marie Sweeney $5,000; Bessie Sweeney (mother of Marie Sweeney) $600; Helen Skiles (a cousin) $300. The residuary estate was devised and bequeathed to the church. By the codicil of even date testatrix bequeathed $300 to Mrs. Ruth Davis (a friend). The will and codicil were witnessed by Dr. Morton and Mr. Deihm (physician and lawyer of testatrix).

In the middle of April 1944, A. Marie Sweeney employed Bessie Helms as housekeeper. From this date until the execution of the codicil of October 4, 1944, Marie Sweeney constantly criticized the church, accusing it of "bleeding" testatrix. She thereafter supervised and regulated testatrix's donations to the church, instructing Annie Davis, testatrix's attorney-in-fact, *what* sums testatrix wished to give. In every instance the gift was less than testatrix had been accustomed to donate.

On October 4, 1944 testatrix executed a codicil to her will. It was witnessed by W. C. Mason, a Justice of the Peace, and Dr. George D. Morton, her attending physician. This codicil was written by Howard B. Wilson, Esq., a Philadelphia lawyer, who prepared it from a written memorandum of *Marie Sweeney* and

handed to him by her when she called at his Philadelphia office. She told Mr. Wilson this was what testatrix wanted. It is not disclosed how this paper reached the *testatrix*. Presumptively it was by the hand of Marie Sweeney. *This codicil revoked the residuary bequest to the church;* in lieu the church was bequeathed $3,000. The church's indebtedness to testatrix of $3,000 was cancelled (this had already been done inter vivos) ; she bequeathed $1,000 to the Coatesville Hospital and divided the residue of the estate in six shares to: Annie R. Davis, Blanche D. Moore, Clara Johnson, Helen Skiles, Bessie A. Sweeney and A. Marie Sweeney.

The subscribing witnesses were interrogated concerning its execution. One of them, Mr. Mason, is a justice of the peace and a neighbor of testatrix. He said he was summoned to testatrix's house either by Marie Sweeney or her mother for the purpose of witnessing a paper; in the room with him were testatrix, Marie Sweeney and Helen Skiles. He testified, p. 55a: ". . . I asked her [testatrix] whether this was of her own free will and accord and without any persons influencing her, and she nodded her head. Q. Nodded her head yes or no? A. She simply nodded her head, and I told her we couldn't take that, we would have to have a direct answer, yes or no, and the nurse put her arms around her and set her up in a sitting position and as her tongue was swollen she arranged her mouth in some way and she then answers, 'Yes it was of her own free will and accord.' "

Also p. 67a: "A. . . . I couldn't understand her and she nodded her head, and when I asked her whether this was of her own free will and accord and so on she nodded her head, and I told her I couldn't accept that, it would have to be yes or no, and the nurse put her arm around her, raised her up in a sitting position. I don't know what she done but probably arranged her tongue or something that I could understand her.

Q. Who arranged whose tongue? A. The nurse. Q. The nurse arranged Mrs. Quein's tongue? A. *She pushed it back in her mouth.*" (Italics supplied.)

When the subscribing witness was asked concerning his opinion of testatrix's mentality, it was said, p. 57a: "Q. What was her condition mentally at the time these codicils were executed? A. I think that her condition was all right although I was not a judge of that. Ask Dr. Morton, as a practicing physician, to give evidence whether she was all right mentally and so on. . . ."

Dr. Morton was the other subscribing witness. He was testatrix's attending physician. At the date of hearing he had been practicing medicine for 54 years and was then over 75 years of age. He testified that in his opinion testatrix's mental faculties were "normal" and that she was positive and opinionated and a hard woman to persuade or influence. He described her physical condition as hereinbefore stated; his diagnosis of the cause of death was "old age", although, because of reasons assigned, he gave a certificate of "death due to heart disease". The doctor said he could not understand testatrix when she tried to talk. He testified, p. 106a: "Q. For how long a time before her death were you unable to understand what she said to you except for a yes or no? A. For months I didn't try. Q. Because you could not understand her? A. I didn't try because it was an effort on her part to make it and me to listen. I didn't have any occasion *because Marie Sweeney was there and could act as interpreter.*" (Italics supplied).

The doctor was asked if testatrix was susceptible to undue influence, p. 112a: "Q. In your opinion did that indicate that she might be subject to some influence or suggestions by some person in making repeated wills? A. I presume she did or she would not have made so many [wills]. I can only presume that from conversation. My personal opinion is that if she had lived six months longer or that she had become dissatisfied with

the Sweeneys or anyone mentioned she would not have hesitated to sit down and change that will and make a new one. That is my personal opinion."

Also p. 115a: "Q. . . . I take it that you are telling the Master that in your opinion she could be influenced by the suggestions of others in the disposition of her property? A. Temporarily she could, and that was evidenced by her making other wills and codicils in her life. Q. You think the times in question, October 4, 1944, and November 9, 1944 with the knowledge of all these facts that she could have been influenced by the suggestions of other persons made to her. about the disposition of her property? A. From my experience of other patients particularly those who die, I can say she did because I have come across other cases in which the last attendants was remembered in wills."

The witness testified (p. 94a) that testatrix was asked ". . . if she approved of the codicil to the will and of [his] witnessing [it] and she said yes. *I could understand it, she nodded her head and said yes.*" (Italics supplied.)

On October 13, 1944, testatrix had a cash balance of $10,304.44 on deposit in her name in the Philadelphia Saving Fund Society. By an order purporting to be signed by her, testatrix transferred this fund into two accounts in her name: one *in trust for A. Marie Sweeney* for one half and the other *in trust for Annie R. Davis* for the other half.

In the latter part of October 1944, Marie Sweeney went to the office of Mr. Wilson, the Philadelphia attorney, with her written memorandum, and requested him to prepare another codicil to testatrix's will. This Mr. Wilson did. Under its terms all legacies to Annie Davis and her sister, Blanche Moore, were revoked. This codicil was executed on October 26, 1944, and was witnessed in precisely the same manner as the one dated October 4, 1944. This codicil *has not been probated.*

It was testified that meantime Marie Sweeney and her mother began to circulate false rumors that Annie Davis had stolen money from testatrix.

In October, Marie Sweeney called at the Philadelphia office of Mr. Wilson and requested him to prepare a letter of attorney from testatrix to Mr. Wilson and his wife, replacing Annie Davis. On October 31, 1944 Mr. and Mrs. Wilson, together with Thomas F. Gain, Esq., a legal associate, called at testatrix's home. After interviewing testatrix and Annie Davis, Mr. Wilson concluded to defer preparing such a letter of attorney *"until testatrix might possibly speak better and make herself understood."* When Marie Sweeney was informed of this fact she became "furious" and stated that "I am getting another lawyer."

R. Asa Pannebaker, Esq., of the Chester County Bar, was the attorney for Helen Skiles, testatrix's cousin and a beneficiary named in the will. About November 1, 1944, Helen Skiles went to Mr. Pannebaker's office in Coatesville and instructed him to prepare a letter of attorney from testatrix to herself, as successor to Annie Davis. Mr. Pannebaker prepared the instrument as directed and handed it to Helen Skiles who took it away for execution. There is no evidence concerning its execution. It appears in the record (p. 337a) and was witnessed by W. C. Mason (the justice of the peace who witnessed the disputed codicils) and by James Skiles, husband of Helen Skiles. On November 8, 1944, the husband of Helen Skiles secured the keys to testatrix's safe deposit box from Annie Davis. The box was opened in the presence of Mr. Deihm, Mr. Pannebaker, Mr. and Mrs. Skiles, Annie Davis and the cashier of the bank. The securities in the box were listed. Thereafter dominion over them was exclusively exercised by Helen Skiles as testatrix's attorney-in-fact. In the safe deposit box Helen Skiles found the will and codicil of

April 12, 1944 and the codicil of October 4, 1944, *and she retained possession of both of them.*

On this day, November 8, 1944, Helen Skiles told Mr. Pannebaker that testatrix desired to make another codicil to her will. The attorney went to see testatrix. In the room with testatrix, he met Marie Sweeney, Helen Skiles and her husband. The attorney said he could not understand testatrix, but *Marie Sweeney and Helen Skiles told him "what [testatrix] wanted to say, what she wanted done."* The attorney then wrote out the directions thus received and asked testatrix if that was what she wanted. He testified that testatrix *"positively nodded and said 'Yes' "*. The attorney returned to his office in Coatesville, dictated the codicil, and delivered it to Helen Skiles when she called for it late the same afternoon. The codicil was executed the *next day,* November 9, 1944. *The execution of this codicil was precisely similar to the execution of the codicil dated October 4, 1944 and with the same witnesses.* Neither codicil was read nor explained to testatrix. By the terms of the codicil of November 9, 1944 a legacy of $5,000 was given to Helen Skiles; $200 was given to Mrs. Arthur White and Bessie Helms (housekeeper); and testatrix revoked a legacy of valuable antiques to Annie Davis, which she gave to the residuary legatees. The residuary estate was bequeathed in four parts (instead of six) to Clara Johnson, Helen M. Skiles (sisters), Bessie A. Sweeney and A. Marie Sweeney (mother and daughter), omitting Annie Davis and her sister, Blanche Moore. Helen M. Skiles was named as sole executrix (replacing as executors the bank cashier, Mr. Newswanger, and testartrix's lawyer, Mr. Deihm).

On the following day, November 10, 1944, the $5,076.68 trust for Annie R. Davis in the Philadelphia Saving Fund was transferred to Marie Sweeney, who thereby became the sole owner of the whole of the $10,304.44. The bank was not satisfied with the sig-

nature of testatrix to this transfer because of patent variance in the signatures of testatrix. W. C. Mason, who witnessed testatrix's signature to the transfer (also the two questioned codicils) took testatrix's formal acknowledgment which he certified under his seal of office. This document was accepted by the bank and the transfer made. The Justice of the Peace testified, however, that he had no recollection of the acknowledgment or the witnessing of this signature.

It is upon the foregoing evidence that contestant bases its charge that the two contested codicils were procured through undue influence. This Court has repeatedly defined undue influence sufficient to void a will. There must be imprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the testator, or destroy his free agency, or to operate as a present restraint upon him in the making of the will: *Keen's Estate*, 299 Pa. 430, 149 A. 737; *Cookson's Estate*, 325 Pa. 81, 188 A. 904; *Buhan, Exr., et al. v. Keslar et al.*, 328 Pa. 312, 194 A. 917; *Olshefski's Estate*, 337 Pa. 420, 11 A. 2d 487; *Royer's Estate*, 339 Pa. 423, 12 A. 2d 923; *Shuey et al., Exrs., v. Shuey et al.*, 340 Pa. 27, 16 A. 2d 4; *Wetzel v. Edwards*, 340 Pa. 121, 16 A. 2d 441; *Ash Will*, 351 Pa. 317, 41 A. 2d 620.

There is a *presumption* of the *absence of undue* influence. The *initial* burden of proof is on contestant: *Cressman Estate*, 346 Pa. 400, 31 A. 2d 109; *Ross Will*, 355 Pa. 112, 49 A. 2d 392. Where there is no evidence of *weakened intellect* the burden is upon those asserting undue influence to prove it even though the bulk of the estate is left to those occupying a *confidential* relation: *Ash Will*, supra, and the cases therein cited. But where there is evidence of *confidential* relation coupled with a *weakened mind,* the burden of proof shifts to proponents. Such evidence, however, need not be sufficient

to establish *testamentary incapacity*. All the evidence need show is bodily infirmity and *weakened mentality*. Where the evidence shows bodily infirmity and greatly *weakened mentality*, and a stranger to the blood of the testator, standing in a confidential relation, is benefited by the will which he has been instrumental in having executed, a *presumption* of undue influence arises: *Adams's Estate*, 220 Pa. 531, 69 A. 989; *Phillips' Estate*, 244 Pa. 35, 90 A. 457; *Schwartz's Estate*, 340 Pa. 170, 16 A. 2d 374; *Hollinger Will*, 351 Pa. 364, 41 A. 2d 554. Conjecture and suspicion do not take the place of testimony: *Royer's Estate*, supra; *Rosenthal's Estate*, 339 Pa. 488, 496, 15 A. 2d 370; *Shuey et al., Exrs., v. Shuey et al.*, supra; *Porter's Estate*, 341 Pa. 476, 19 A. 2d 731; *Ash Will*, supra. *But undue influence may be established by circumstantial evidence: Boyd v. Boyd*, 66 Pa. 283; *W. H. Herster et al. v. A. J. Herster et al.*, 116 Pa. 612, 11 A. 410; *Reichenbach v. Ruddach*, 127 Pa. 564, 18 A. 432. Undue influence is so intangible and illusive that it can be rarely proven by personal observation, i. e., by testimonial or direct evidence. Mr. Justice HORACE STERN said in *Freed's Estate*, 327 Pa. 572, 577, 195 A. 22:

"While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human experience can—and in a case such as the present must—recognize it as the causative factor which linked the execution of this highly unnatural will to the circumstances preceding and attending it, and in which appellant, the sole beneficiary, played such a ruthless and dominating part."

It is clear, therefore, that even if a decedent was physically infirm or ill and a confidential relation existed, but there is no proof of *mental* weakness, the burden is upon *contestant* to establish the existence of undue influence. Where, however, in addition to phys-

ical infirmity or illness, decedent's mind was *weakened* [even though not to the extent of testamentary incapacity] the burden rests upon *proponent* to establish the *absence* of undue influence. *Thus the controlling question in the present case, since there existed a conceded confidential relation, is whether testatrix's mind was weakened.* Dr. Bamberger, her family physician, testified that it was. True he did not *see* testatrix after he entered the Army in October 1942. But at *this early date* (two years and a half before death) testatrix was *then* suffering from progressive infirmities of old age: arteriosclerosis and a stroke. The doctor testified that this *"weakened her mental capacity* and made her susceptible to influence." *Marie Sweeney did not testify.* Mrs. Skiles did not testify *concerning testatrix's mental condition.* The testimony of the subscribing witnesses to the codicils concerning testatrix's mental condition is illuminating. Dr. Morton said that he could not understand what testatrix said but was informed of what she meant by her "interpreter", Marie Sweeney, the nurse. He testified that while, in his opinion, testatrix was mentally competent, she *could be* "temporarily" influenced. Mr. Mason, the other witness, *refused to commit himself as to testatrix's mentality,* but referred his interrogator to Dr. Morton. He said he asked testatrix if she signed the codicils "of her own free will and accord" and she answered "yes". *But this answer was given only after the nurse had pushed testatrix's tongue back in her mouth in order to enable her to utter the single word "yes".*

The *credibility* of these subscribing witnesses is clearly at issue. In connection with their testimony, we must consider testatrix's advanced age; her deplorable physical condition; the diagnosis of Dr. Morton of death from old age; that it was *Dr. Morton* who secured the services of Marie Sweeney as nurse and was her active partisan in this litigation; that the nurse and

her mother, in the short period of *less than a year* (they came into testatrix's home as complete strangers), secured $5,600 by the will and under the codicils half of the entire residuary estate (said at argument to amount to $70,000). Marie Sweeney, in addition, obtained from testatrix in her liftime, during this period, $10,000 in cash. The other half of the residuary estate was passed by the questioned codicils to Helen Skiles, testatrix's cousin and attorney-in-fact, who actively coöperated with Marie Sweeney in obtaining the execution of the codicils.

In speaking of credibility of witnesses, Chief Justice MAXEY in the *Estate of Rosamond Pinchot Gaston* (filed January 3, 1949), said: "We said in Kirshon et ux. v. Friedman, 349 Pa. 171, 181, 36 A. 2d 647: 'It is an elementary principle that in considering the credibility of witnesses their manner of testifying, their apparent candor, intelligence, personal interest and bias or lack of it, are to be considered in determining what weight shall be given to such testimony.' See also Belmont Laboratories, Inc., v. Heist et al., 300 Pa. 542, 151 A. 15, and Jones v. Motor Sales Co., et al., 322 Pa. 492, 185 A. 809. 70 C. J. Sec. 952 makes this statement: 'In determining the weight to be attached to the testimony of a witness it is proper to consider his appearance, general bearing, conduct on the stand, demeanor, manner of testifying, such as candor or frankness, or the clearness of his statements, and even the intonation of his voice. So the positiveness of the witness, as well as his uncertainty as to the facts as to which testimony is given, may be considered'. See also 28 R. C. L. Sec. 243, which says: 'The mental condition of a witness as manifested by him on the witness stand almost invariably influences the jury as to the weight they will give his testimony. The manner in which a witness tells his story; the advantages he appears to have had for gaining

accurate information on the subject; the accuracy and retentiveness of his memory; his capacity for consecutive narration of acts and events; his apparent frankness and intelligence, and numerous other considerations—all go to make up the sum total of credibility that the jury will give to the evidence of any particular witness.'. This principle is apposite to the case now under review for it is just as applicable when an auditor or a judge, instead of a jury, acts as trier of the facts."

The facts in this case are *not* undisputed. The existence or non-existence of undue influence therefore cannot be found *from inference or conclusion.* A substantial issue of fact *is* presented. Credibility of the subscribing witnesses, the weight to be given to their testimony because of their character, intelligence and knowledge of the subject, must be determined by a judge or by a jury *who sees and hears them*: *Steinmeyer v. Siebert,* 190 Pa. 471, 42 A. 880; *Belmont Laboratories, Inc., v. Heist et al.,* 300 Pa. 542, 151 A. 15; *Swoope's Estate,* 317 Pa. 584, 177 A. 748; *Deal's Estate,* 321 Pa. 484, 184 A. 453. This Court will not, under the present evidence, decree *as a fact* the existence or non-existence of undue influence *by inference or conclusion.* Such issue must be determined initially by a legal fact finding tribunal. Cf. *Griffith Will,* 358 Pa. 474, 57 A. 2d. 893.

We have reviewed the procedure in this case. The validity of the will and codicil respectively dated April 12, 1944 being unchallenged, the Honey Brook Methodist Church, the residuary devisee and legatee, is the only one interested in this contest *as contestant.* The will and codicils having been probated on April 18, 1945, the appeal, taken *April 4, 1946,* was timely and complied with section 21 (a) of the Register of Wills Act of 1917, P. L. 415, 20 PS, 2005. Having perfected the appeal, the record was certified to the orphans' court by the register. Contestant *then* petitioned the orphans' court for a citation directed to all parties named in both

codicils to show cause why the appeal should not be sustained and the probate of the two codicils set aside. Cf. *Laukhuff's Estate*, 218 Pa. 585, 67 A. 874. Answers were filed by the four residuary legatees.

In a will contest contestant ordinarily requests the grant of an issue *devisavit vel non*. This is an ancient legal process, the origin of which has probably been lost in antiquity. According to Burill's Law Dictionary, Vol. 1, p. 486, these Latin words may be translated "did he devise or not?" or "will or not will?" which Wooddesson, in his Lectures on the Law of England (Second Edition, Vol. 3, Lecture 59, p. 286) criticises as being "barbarously expressed". The function of this process is to direct a *jury* to find the facts upon which the validity of a will might be determined. As stated by Lord Chief Justice TINDAL, in *Tatham v. Wright*, 2 Russ. & M. 1, 15 (39 English Reports 295, 300) such trial by *jury* " . . . by *experience, is found best adapted to the investigation of the truth.*" (Italics supplied).

Various orphans' court acts have provided for the grants of such issues but the practice is now settled by the Orphans' Court Act of 1917, P. L. 363, section 21 (b), 20 P.S, 2582, which provides: "Whenever a dispute upon a matter of fact arises before any orphans' court, on appeal from any register of wills, or on removal from any register of wills by certification, the said court shall, *at the request of either party,* direct a precept for an issue to the court of common pleas . . . which, in the case of an issue *devisavit vel non,* shall be . . ." (Italics supplied.). Statutory procedure must be followed. Mr. Justice LINN said in *Bartron v. Northampton County*, 342 Pa. 163, 168, 19 A. 2d 263: ". . . where a remedy or method of procedure is provided by an Act, its provisions shall be strictly pursued and exclusively applied." *Thompson v. Morrison*, 352 Pa. 616, 624, 44 A. 2d 55; *Era Co., Ltd., v. Pittsburgh Consolidation Coal Co.*, 355 Pa. 219, 220, 49 A. 2d 342.

*There was no request for the grant of an issue devisavit vel non.* Where no issue is demanded the *orphans' court* may determine all questions: *Roney's Estate,* 309 Pa. 309, 313, 164 A. 55; *Pusey's Estate,* 321 Pa. 248, 267, 184 A. 844; *Freed's Estate,* 327 Pa. 572, 576, 195 A. 22. *An issue may be awarded, nevertheless, by the court on its own motion even though an issue is not demanded: Byerly's Estate,* 258 Pa. 410, 413, 102 A. 143; *Cross's Estate,* 278 Pa. 170, 173, 122 A. 267. The learned court below accurately stated (p. 495a) : ". . . neither contestants nor proponents have requested or suggested that an issue be submitted to a jury . . . the Court even in the absence of such request may, on its own motion, take such action . . ." The Court, however, concluded *not* to award an issue and stated that *it* "would determine the questions of fact." *The court appointed a master "to take testimony and make findings and recommendations for a decree."* It is stated in the opinion that this procedure is in accordance with the provisions of section 20 (b) 1 of the Orphans' Court Act of 1917, supra, 20 PS 2521, which reads as follows: "In all proceedings *begun by petition,* where an issue of fact is raised, it shall be within the discretion of the orphans' court, by general rule or by special order in the case, to provide for the reference of the case to a master to take the testimony and report his findings and his recommendations as to a decree; . . ." (Italics supplied.)

A will contest, however, is *not* a proceeding "begun" by a petition in the orphans' court. The proceeding comes into the orphans' court *on an appeal from a decree of the register of wills,* or certified to the court by the register. *In absence of a constitutional provision or valid statutory enactment, and there are none, the orphans' court, in a will contest, may not delegate its judicial function to a master to find facts and make appropriate decrees.* No appellate approval of such a practice has been cited and our own research discloses

none. The facts in a will contest must be determined either by a judge or a jury in accordance with the various statutes hereinbefore cited relating to contests of wills. Cf. *Griffith Will*, 358 Pa. 474, 477, 57 A. 2d 893.

The learned court below treated the report of the master as if it were a report of an orphans' court *examiner* whose function was to take testimony of witnesses, but without authority to pass upon it. This procedure was abolished by section 20 (b) 1 of the Orphans' Court Act of 1917, supra. The *court in banc* accepted most of the facts so assembled by the master, but made its own findings of fact and conclusions of law. As above stated, the court rejected the finding of the master that the codicils had been obtained through undue influence because, in the opinion of the court, they were the result of the master's deductions and inferences with which the court disagreed. It is true that where findings of fact are the result of reasoning, inferences and deductions, a *reviewing court* need not accept such conclusions, but may make its own findings: *Kittel's Estate,* 156 Pa. 445, 26 A. 1116; *Dorrance's Estate,* 309 Pa. 151, 163 A. 303; *Jac Estate,* 355 Pa. 137, 49 A. 2d 360, and cases therein cited. While *most* of the facts may be undisputed, the pivotal and controlling ones, to wit: *proof* of the weakened mental condition of testatrix, fraud and duress, and of the consequent possible existence of undue influence, are highly controversial. Had the able master been *legally* empowered to find facts, the exclusive function of a reviewing court would have been to examine the testimony and ascertain whether the findings were sufficiently supported. *Findings of fact of the learned court below based entirely upon inference, reasoning and deduction from testimony of witnesses whom it did not see or hear, before an unauthorized master, will not be accepted and adopted by this Court.* The evidence clearly discloses substantial issues of fact, viz: (a) whether this testatrix was weak in mind;

(b) whether testatrix was, in effect, *imprisoned* since she was confined to her bedroom because of her broken hip and general debilitated physical condition and there being testimony that all visitors were excluded except those whom Marie Sweeney chose to admit; (c) whether there was fraud perpetrated on testatrix, as it was testified that Marie Sweeney and her mother circulated false statements and rumors concerning the honesty of Annie Davis and alleged avariciousness on the part of testatrix's church and pastor: *Hook's Estate*, 207 Pa. 203, 56 A. 428; *Ferner v. Byers*, 219 Pa. 160, 68 A. 48; *South Side Trust Co. v. McGrew*, 219 Pa. 606, 69 A. 79; *Breining v. Born*, 230 Pa. 24, 79 A. 167; (d) whether testatrix possessed an intelligent knowledge that she was executing codicils to her will.

It is to be noted that it was *Marie Sweeney* who gave the scriveners the information for the preparation of the codicils and was present at the execution of both of them. Helen Skiles was also present at the execution of the codicil of November 9, 1944, having instructed *her own attorney,* Mr. Pannebaker, to prepare it. See: *Stewart' Will,* 354 Pa. 288, 47 A. 2d 204; *Dugacki Will,* 356 Pa. 143, 51 A. 2d 627.

To avoid unnecessary delay and expense, we will not remit the record to the court below to determine preliminarily whether there exists a substantial dispute of fact: Cf. *DeLaurentiis's Estate*, 323 Pa. 70, 186 A. 359; *Lare Will,* 352 Pa. 323, 42 A. 2d 801, and the many cases which follow them. *A substantial dispute is disclosed both in the testimony and in the opinion of the court.* The record is remitted with direction to the court below to award an appropriate issue *devisavit vel non* to determine whether the questioned codicils were procured through undue influence, fraud or duress. This issue may be tried by a jury in the common pleas, by a jury in the orphans' court, or by a judge in the orphans' court without a jury if the parties so agree, in accord-

ance with the statutes hereinbefore cited: Cf. *Griffith Will*, supra. The proper procedure to be followed at the hearing has been frequently stated by this Court: *Keen's Estate*, 299 Pa. 430, 149 A. 737; *Plotts' Estate*, 335 Pa. 81, 5 A. 2d 901; *Szmahl's Estate*, 335 Pa. 89, 6 A. 2d 267.

Decree reversed; the record is remitted with direction to proceed in accordance with this opinion; costs to abide the event.