## Paul Will.

32

Argued October 3, 1961. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

reargument refused May 3, 1962.

*David B. Buerger*, with him *Alexander McIlvaine,
Wray G. Zelt, Jr., Robert L. Frantz*, and *Buchanan,
Ingersoll, Rodewald, Kyle & Buerger*, for appellants.

*Thomas L. Anderson*, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES,
March 20, 1962:

A narrow issue is presented: In refusing to grant
an issue d.v.n. to determine whether undue influence
had been exerted upon the testatrix of this will, did
the court below abuse its discretion?

Sophie Paul (testatrix), an 83 year old resident of
Washington County, died on January 31, 1955 survived
by a first cousin (Earle Forrest), an aunt (Margaret
Hayes), and two nephews[1] (J. William Paul and Sam-
uel H. Paul), the latter being the present appellants.

Testatrix' last will, admittedly executed by her on
September 30, 1954, was probated by the Register of
Wills of Washington County on February 3, 1955. So
far as presently pertinent, this will provided: (a) gifts
of personalty and realty totalling $29,071.17 to seven-

---

[1] Appellants are nephews, by blood, of I. Edward Paul, testa-
trix' husband, who predeceased her on June 27, 1951.

teen different friends, testatrix' aunt, certain charities and past and present employees; (b) a gift of realty, inventoried at $44,078.66, to Earle Forrest, a first cousin and the named executor; (3) *a gift of 84 shares of the capital stock of Penn Manufacturing Corporation*[2] (Penn) plus a filing cabinet and its contents *to John McCreight* (McCreight), *testatrix' lawyer and the scrivener of her will;* (4) a gift of the residue to the appellants. The will provided that "all transfer, inheritance, succession and estate taxes" were to be paid out of the residuary estate.

The estate was inventoried at $163,367.52.[3] After payment of debts, administration expenses, specific legacies, inheritance and estate taxes (including taxes imposed by both state and federal governments on the Penn stock), appellants claim they will each receive as their share of the residuary estate less than $1900.[4]

Administration of the estate was completed, an account filed and audited and distribution decreed March 26, 1956. Almost 3½ years after probate of the will and 2 1/3 years after the distribution decree, the residuary legatees appealed from the probate of the will.[5] These appeals were heard in the Orphans' Court of Washington County. After hearing, the hearing judge

---

[2] Penn, located in Washington, Pa., is engaged in the fabrication of steel, oil and gas well supplies, its capital stock being closely held.

[3] Penn stock was inventoried at $50 per share, although it was valued by the federal tax authorities at $800 per share. Whatever its value, testatrix' property, exclusive of Penn stock, was worth approximately $159,000.

[4] The estate contends that the total net distribution from the residuary estate will be $13,155.54 or $6,577.77 to each appellant.

[5] When this litigation began, the estate, by preliminary objections, urged dismissal of the appeals because tardily filed. At the hearing, the estate withdrew that defense and urged the matter be disposed of on its merits.

(the then President Judge ANDERSON) dismissed the appeals and refused an issue d.v.n. on the question of whether McCreight had exerted undue influence on testatrix which caused her to make the bequest to him in paragraph 15 of the will. Thereafter, the then President Judge MARINO dismissed the exceptions to the decree nisi and entered a final decree upholding the dismissal of the appeals. From that decree, appeals were taken to this Court.

The sole issue in the court below was whether McCreight had exerted undue influence upon the testatrix which caused her to provide in her will: "15. I give and bequeath to John B. McCreight 84 shares of the capital stock of The Penn Manufacturing Corporation and the filing case and contents in the second floor office."

Appellants contend that McCreight, occupying a confidential relationship to testatrix, by the exercise of fraud, misrepresentation and concealment, unduly influenced the testatrix to make this bequest of Penn stock to him. Specifically, it is charged that McCreight, knowing that Penn stock was valuable stock, by fraud, led testatrix to believe that such stock was worth only $50 per share and that the bequest of such stock to him would amount to less than 3% of the total value of her estate and that, as McCreight intended, testatrix relied upon such misrepresentations and made the bequest to McCreight always laboring under the misapprehension that the total bequest amounted to less than 3% of her estate. Upon such basis, it is urged that paragraph 15 of the will is invalid and its probate should be set aside.

In our examination of this record we must be guided by certain principles well settled in this area of the law: (1) there is "a *presumption* of the *absence* of undue influence" (*Quein Will*, 361 Pa. 133, 145, 62 A. 2d 909; *Citizens National Bank v. McCafferty,* 383 Pa.

588, 597, 119 A. 2d 297; *Erdeljac Will,* 388 Pa. 327, 329, 131 A. 2d 97) ; (2) where testatrix' testamentary capacity is established and there is no evidence of any infirmity, by reason of physical or mental affliction, it is the burden of those who charge undue influence to prove it, even though a large part of testatrix' estate is left to a person who occupied a confidential relationship to her (*Citizens National Bank v. McCafferty,* supra, 597; *May v. Fidelity Trust Co.,* 375 Pa. 135, 145, 99 A. 2d 880; *Snedeker Estate,* 368 Pa. 607, 612, 84 A. 2d 568; *Quein Will,* supra, 145; *Ash Will,* 351 Pa. 317, 322, 41 A. 2d 620; *Phillips' Estate,* 244 Pa. 35, 44, 90 A. 457) ; (3) where it is charged that a person of sound mind and possessing testamentary capacity has been subjected to undue influence, the evidence to support such charge must be clear and convincing (*Cressman Estate,* 346 Pa. 400, 404, 31 A. 2d 109; *Royer's Estate,* 339 Pa. 423, 424, 425, 12 A. 2d 923; *Fink's Estate,* 310 Pa. 453, 456, 165 A. 832; *Eble v. Fidelity Title & Trust Co., etc.,* 238 Pa. 585, 589, 86 A. 485) and mere suspicions, opinions or beliefs not founded on established facts are insufficient to support such charge (*Cressman Estate,* supra, 404; *Royer's Estate,* supra, 425) ; (4) to sustain a charge of undue influence it must be shown that at the time and in the act of making her will the testatrix was subject to such undue influence (*Cressman Estate,* supra, 404; *Tetlow's Estate,* 269 Pa. 486, 496, 112 A. 758).

Appellants, relying on *Yardley v. Cuthbertson,* 108 Pa. 395, 1 A. 765, would have us take the position that, even though the testatrix possessed testamentary capacity and was neither physically nor mentally infirm, it was McCreight's burden, as her confidential adviser, scrivener of her will and the beneficiary of a substantial portion of her estate, to show by clear and satisfactory evidence that the testatrix fully understood the testamentary disposition of her property, particularly

as to the value of the stock bequeathed to him. This position, under the authorities, we cannot take. While it is true that there is some language of the Court in *Yardley*, which seems to support this view, yet the *only* decisional point in *Yardley* was that, where the testatrix was infirm mentally although possessing testamentary capacity, the scrivener of the will to whom the bulk of the estate was bequeathed had the burden of proving that the testatrix labored under no mistaken apprehension as to the value of her property and the amount she was giving to her confidential adviser. Subsequent decisions confirm this interpretation of *Yardley: Pusey's Estate*, 321 Pa. 248, 267, 268, 184 A. 844; *Llewellyn's Estate*, 296 Pa. 74, 82, 145 A. 810; *Gongaware v. Donehoo*, 255 Pa. 502, 508, 100 A. 264; *Phillips' Estate*, supra, 44; *Hook's Estate*, 207 Pa. 203, 56 A. 428; *Yorke's Estate*, 185 Pa. 61, 70, 39 A. 1119. Present testamentary capacity and absent evidence of physical or mental infirmity, the burden of proof of undue infuence is upon those who charge it. *The burden in the case at bar was upon the appellants to prove, not upon McCreight to disprove, undue influence; such proof had to be clear and convincing.*

To exactly define that which constitutes undue influence is most difficult. The classic definition is set forth in *Quein Will*, supra, 145: "This Court has repeatedly defined undue influence sufficient to void a will. There must be imprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of the testator, or destroy his free agency, or to operate as a present restraint upon him in the making of the will: [citing cases]." In *Caughey v. Bridenbaugh*, 208 Pa. 414, 421, 57 A. 821, we approved this language: "As a legal phrase [undue] is used in a stricter sense as denoting . . . something legally wrong, something viola-

tive of a legal duty—in a word something illegal. And again the word 'influence' does not refer to any and every line of conduct capable of disposing in one's favor a free and self-directing mind, but to a *control acquired over another which virtually destroys his free agency.*" (Emphasis supplied). To affect a will the undue influence must be such "as subjugates the mind of the testator to the will of the person operating upon it: . . .": *Eble v. Fidelity Title & Trust Co., etc.,* supra, 585. In *Freed's Estate,* 327 Pa. 572, 577, 195 A. 22, 24, undue influence was described as "subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science" which, nevertheless can be recognized by "human experience" as "the causative factor" linking the execution of a highly, unnatural will to circumstances preceding and attending such execution. It is the duty of the law to ensure that a person's disposition of property shall be what it professes to be, literally *his* or *her* will. If, by the exercise of undue influence, a person causes a disposition of the property of another according to his will rather than the will of the owner of the property, then the law steps in and declares such disposition ineffective.

Turning to the instant record we find certain facts established at the outset of the hearing by way of stipulation and admissions in the pleadings received into evidence. It is established as a fact that *at the time of the execution of this will testatrix was of sound mind and possessed testamentary capacity and, even though of advanced age, she was not infirm either physically or mentally.* Other conceded facts are that testatrix' will was prepared by McCreight and witnessed by two of his employees, that he occupied a confidential relationship to testatrix, that he had been attorney for both testatrix' husband and his estate and that the Penn stock had been owned by testatrix' hus-

band and, subsequently, became part of testatrix' estate.

Testatrix' personal representative having offered in evidence the record of the probate by the Register of Wills of this will, it then became appellants' " 'duty to come forward with evidence' ": *Kerr v. O'Donovan,* 389 Pa. 614, 623, 134 A. 2d 213 and cases therein cited. On the posture of this record from that time forward it was appellants' burden to sustain, *by clear and convincing proof,* the charge of undue influence and this burden did not shift.

Appellants would have us examine the record from four angles: to that suggestion we accede.

### 1.

### What Was the Value of the Penn Stock at the Time of Execution of the Will?

As counsel for testatrix' husband's estate and testatrix' estate—in the inventories filed and in the returns made for federal and state tax purposes—McCreight consistently stated the value of this stock as $50 per share. The record indicates that Penn stock was closely held, that one F. K. Fawcett, 78 years of age, was president, active head, manager and chief salesman for the corporation, that financial statements were not given to anyone and that Fawcett resented inquiries into the financial status of the business to the extent that, upon the declaration of dividends, he paid, by cash or cashier's checks, the amount of the dividends. Between 1950-1954 there were no known sales of the stock and Fawcett testified that no one besides himself knew the value of the stock and, even though he did not know the market value exactly, he would never offer $800 per share for the stock. Thus, the record presents the picture of a corporation around whose financial condition Fawcett had drawn an "iron curtain",

a corporation completely dominated by a man of advanced years who went to unusual lengths to hide—for no other reason than that it was not the business of anyone else—its financial condition. The only value which Fawcett would give was its *par* value of $50 per share. Against this background, appellants sought to prove the "fair" value of this stock.

After an investigation of Penn's financial condition, the federal tax authorities after testatrix' death placed a value on Penn stock of $800 per share. *In this value McCreight must be deemed to have acquiesced because he approved as counsel for the estate the payment of taxes based on that value.* Appellants then sought to prove that Penn stock had a value at least of $800 per share through the testimony of one H. R. Stull, a certified public accountant who had examined Penn's records. At first, the court below sustained an objection to this testimony, then later the court permitted such testimony to be taken and, again later, in its adjudication, rejected such testimony. In this respect, the court erred. This testimony was material and relevant and, for the purpose of these appeals, we have considered this testimony as tending to show a value of at least $800 per share on Penn stock. Furthermore, the dividend record of Penn clearly and unequivocally shows that the value of $50 per share for this stock was ridiculous. Dividends were paid during the pertinent years as follows: 1950-$100, 1951-$100, 1952-$150, 1954-$100 or a total of $450.[6] The record facts indicate that Penn stock had a value of approximately $800 per share during this period; in fact, payment of taxes on the basis of $800 per share by the estate with the acquiescence of McCreight would seem to preclude him from questioning that value.

---

[6] Dividends omitted, supra, because paid after testatrix' death were: 1955-$50, 1956-$50.

2.

## What, If Any, Knowledge Did McCreight Have as to the Value of This Stock During Testatrix' Lifetime?

In examining the record for this purpose we must bear in mind that testatrix made *three* wills in each of which this bequest to McCreight was contained—one in November or December, 1951, one in February, 1952 and the last in September, 1954—so that McCreight's knowledge of the value of the stock from a date prior to the execution of the first until the execution of the last will is pertinent. The record indicates that, *after* the death of testatrix' husband and *prior* to the execution of the first will, McCreight filed an inventory in testatrix' husband's estate in which the value of the stock was given as $50 per share. When he inquired of a Washington, Pa., stockholder, according to Mc-Creight's testimony, he was told the stock had "no value"; upon acquainting testatrix with that information she told him that the stock paid dividends, that it did have value and that he should inquire from Fawcett as to the value of the stock; that he inquired of Fawcett and was told that the "fair" value was $50 per share.[7] If such testimony is to be believed, then, prior to the execution of the first will, all McCreight knew was that the stock had a value of $50 per share. In the early part of 1952, McCreight was present when information was given to testatrix' accountant of the payment of a dividend of $100 per share on this stock in 1951 and McCreight admitted that he knew Penn had paid a dividend of $150 per share in October, 1952. Though there was no direct evidence of knowledge on McCreight's part of the dividend of $100 paid in October, 1950, the tax return for 1950 of testatrix' husband, to whom this dividend had been paid, was in Mc-

---

[7] Contradiction of this testimony will be discussed, infra.

Creight's office. Again, though there was no direct evidence that McCreight knew of the dividend of $100 per share paid in January, 1954, a notation of the receipt of that dividend was in an account book which was in McCreight's possession. Even if McCreight had knowledge only of the 1951 and 1952 dividends totalling $250, it taxes one's credulity that a lawyer would believe that a stock productive of such dividends had a value of only $50 per share, 20% of the two-year dividends.

### 3.
### What, If Anything, Did McCreight Tell Testatrix as to the Value of Penn Stock?

In ascertaining the record answer to this inquiry, we bear in mind two concessions by appellants: (a) that testatrix was an intelligent woman fully possessed of her mental faculties and (b) that on the occasion of the preparation of testatrix' first will there was no discussion between McCreight and testatrix as to the value of Penn stock or the proportion which it bore to the entire estate.[8] Moreover, when all three wills were executed, testatrix knew the dividends which had been paid and, *at the time of execution of the last will,* she knew the dividend record from 1951-1954 of payments of $450 per share of stock. When, at the time of searching for a value for inventory purposes in the husband's estate, McCreight told testatrix the stock had "no value", the testatrix told him that the stock did have value because it paid dividends. To this McCreight replied such dividends "might be the last gasp of a defunct corporation"; for this statement of opinion there appears of record no basis of fact and the question arises whether this simply was an off-hand opinion of McCreight or whether it was given with an ulterior mo-

---

[8] Appellants' brief, p. 6.

tive in mind, i.e., to depreciate in testatrix' mind the value of the stock.

As related above, at testatrix' suggestion McCreight called Fawcett and later related to testatrix that *Fawcett told him that the fair value of the stock was $50 per share.* Fawcett testified that, although he might have, he did not recall talking to McCreight after I. E. Paul's death; however, the important feature of Fawcett's testimony is that, while he would have given the *par* value of the stock, he would not have given the *fair* value. *If Fawcett be believed,* then McCreight's statement to testatrix was not correct; if it was not correct, was it so given that the value of the stock might be depreciated in testatrix' mind?

When testatrix and McCreight talked in the early part of 1953 concerning the 1952 $150 dividend, Mc-Creight told her of a conversation he had had with a Mr. Bigler who had approached him for a loan. According to McCreight, Bigler, whose father-in-law worked for Penn, stated that Fawcett was disgusted with the union at the plant, that Fawcett was going to sell his stock in Penn and that Penn would be taken over by some other purchaser or liquidated. Upon relating this to testatrix, McCreight, according to his testimony, was told by the testatrix that Fawcett had already talked to her about a sale or liquidation of Penn but had assured her that, if that happened, he would take care of her interests. Bigler testified that in his conversation with McCreight, the only reference to Penn arose in connection with a discussion of his lack of collateral for the loan which he sought and he stated that, ultimately, he might get some collateral "possibly through a sale of the stock, or a liquidation of the stock" in Penn which Bigler's father-in-law owned. Reading Bigler's testimony, it is clear that when he referred to a sale or liquidation it was not of Penn but of his father-in-law's stock in Penn. The conflict be-

tween Bigler and McCreight is substantial and, if Bigler be believed, then that which McCreight told testatrix was not correct.

McCreight's statement to testatrix that the stock had "no value" was incorrect; his statement to her that Fawcett told him the *fair* value was $50 per share is contradicted by Fawcett; his statement to testatrix that Bigler had told him that Fawcett was going to sell the stock or liquidate Penn is contradicted by Bigler; the statement that the dividends were "the last gasp of a defunct corporation" could be simply an opinion without basis in fact or motivated by a desire to depreciate the value of the stock. At best, the advice given by McCreight concerning the stock's value was without basis in fact, at least if Fawcett and Bigler be believed.

## 4.
## Was Testatrix Induced, by Fraud or Misrepresentation on McCreight's Part as to the Value of the Penn Stock, To Make This Bequest to McCreight?

Appellants cannot question that testatrix wanted McCreight to be a *beneficiary* of part of her estate; such desire on testatrix' part was clearly expressed in the three last wills which she made.[9] So far as appellants are concerned, the nub of their argument is that testatrix did not know that McCreight would be the beneficiary of *so much* of the estate nor did she realize *how much* of her estate was bequeathed to McCreight because the *true value* of the stock had been concealed from her by misrepresentation on McCreight's part. Appellants' argument requires that four propositions be sustained: (a) that the true value of the stock was

---

[9] There is not a scintilla of evidence that McCreight unduly or in any manner influenced testatrix to name him in her will; on the contrary, it is evident that the suggestion that he be a beneficiary arose *solely* from testatrix.

44

$800, not $50, per share; (b) that McCreight knew this true value; (c) that, by fraud and misrepresentation, McCreight concealed the true value from testatrix and lulled her into believing that, on the basis of a $50 per share value, she was bequeathing McCreight less than 3% of her estate; (d) that had testatrix known the true value of the Penn stock which represented approximately 33% of her gross estate she would not have made this bequest.

It is with the last proposition we now deal. The difficulty with appellants' argument in this respect is two-fold.

In the first place, testatrix knew or should have known that the stock was worth considerably more than $50 per share. Despite what McCreight told her, the testatrix, as an intelligent business woman and the recipient of dividends over the four year period from 1951 to 1954, knew that the stock, reputedly only worth $50 per share, paid these dividends in the amount of $450, more than seven times its reputed value. In view of this dividend record, how could testatrix have been lulled into believing by anything McCreight told her that the stock was worth only $50 per share? Had the testatrix been infirm, mentally or physically, the picture might have been different, but in the case at bar we deal with a woman who was not only sound mentally and not infirm but an intelligent business woman.

In the second place, assuming *arguendo*, that the testatrix by misrepresentations on the part of McCreight had been led to believe that the stock was worth only $50 per share, what evidence is there on this record that, had she known the true value of this stock, she would not have made this bequest? Stated otherwise, what evidence is there on this record that testatrix intended McCreight to be the beneficiary only of 84 shares of Penn worth $50 per share and not of

84 shares of Penn worth $800 per share? It was the burden of appellants to prove that undue influence, exercised by fraud and misrepresentations, exerted by McCreight brought about a result which was not the will of the testatrix. We have searched in vain for *any* evidence upon this record that, had testatrix known that her bequest to McCreight would amount to $67,-000 rather than $4200, she would not have made the bequest.

It is argued that the will is unnatural, but in this connection, it must be noted that testatrix did take care of her aunt, her first cousin and, in addition to making appellants residuary legatees under this will, had previously conveyed to them an interest in a farm —in some measure, all blood relatives and even nephews not of the blood had been taken care of. Furthermore, absent any proof of undue influence, the fact that a will appears to be unnatural is not ground for setting it or any of its provisions aside. Every person has a right to dispose of his or her own property as he or she sees fit: *Sommerville Will*, 406 Pa. 207, 225, 174 A. 2d 496. It is also argued that McCreight should have advised testatrix, when he learned that she desired that he be a beneficiary in the will, to secure the services of independent counsel. There cannot be the slightest doubt that it would have been far wiser had McCreight done so. At the hearing, McCreight testified that he had so advised testatrix but that she had refused his suggestion, although in his depositions taken six weeks prior to the trial McCreight did not so testify. However, such failure to secure independent counsel is not controlling under the circumstances.

True, there are circumstances on this record which may give rise to suspicion and there is evidence which, if believed by a jury, would indicate that McCreight, knowing the value of the stock, gave incorrect information to testatrix on certain occasions but there is no

evidence that testatrix did not know the true value of this stock and there is no evidence that, even if she did not know its true value and believed it to be worth only $50 per share, that she would not have made this bequest had she known its true value.[10]

It was the duty of appellants to prove, *by clear and convincing evidence,* that McCreight by undue influence, exercised through fraud and misrepresentations as to the true value of this stock, caused testatrix to make a bequest to him of approximately 33% of her estate whereas she intended to make a bequest to him of less than 3% of the estate. This burden has not been met. Suspicion, surmise and conjecture cannot take the place of proof. Our courts have consistently set forth the quality of the proof required—*clear and convincing evidence*—to set aside a will on the ground of undue influence and the proof on this record falls far short of that standard. Under the circumstances, the court below properly refused to grant an issue d.v.n. on the question of undue influence.

Decree affirmed. Each party to pay own costs.

Mr. Chief Justice BELL dissents.

---

[10] In this connection we have considered the evidence, rejected by the court below erroneously, as to events which occurred *after* testatrix' death which tended to show that McCreight concealed from appellants the true value of this stock.